**INTERNATIONAL LATEX CORPORATION, Plaintiff,**

v.

**WARNER BROTHERS COMPANY, Defendant.**

**Civ. No. 5151.**

United States District Court
D. Connecticut.

Jan. 13, 1959.

756

Simon H. Rifkind, Paul, Weiss, Rifkind, Wharton & Garrison, Jay H. Topkis, William H. Davis, Davis, Hoxie & Faithfull, George E. Faithfull, New York City, Curtiss K. Thompson, Thompson, Weir & Barclay, New Haven, Conn., for plaintiff.

Stephen H. Philbin, Fish, Richardson & Neave, E. Cummings Sanborn, New York City, William Reeves, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for defendant.

ANDERSON, District Judge.

### Findings of Fact.

1. On October 17, 1944 U. S. Patent No. 2,360,736 was issued to Abraham N. Spanel on an application filed June 26, 1940. Spanel assigned the patent to the plaintiff, which in this action is suing the defendant for infringement.

2. The plaintiff, the owner of the patent and of all rights of recovery for any infringement, is a Delaware corporation having its principal place of business in Dover.

3. The defendant is a Connecticut corporation having its principal place of business in Bridgeport.

4. The subject of the patent is the "seamless dipped latex girdle"; and the issues of validity and infringement concern Claims 1, 2, 3 and 6, each of which describes a preferred form of a one-piece integral girdle made of deposited latex. These claims are:

"1. An integral one-piece supporting girdle formed of deposited latex sheet material of a strength and shape throughout to apply constrictive force to the flesh around the lower torso of the wearer, the external surfaces of said sheet material being smooth and the inside surfaces thereof being of a slightly roughened matted character for contact with the skin of the wearer.

"2. An integral one-piece supporting girdle formed of deposited latex sheet material of a strength and shape throughout to apply constrictive force to the flesh around the lower torso of the wearer, the internal surfaces of said sheet material being of a matted character and such as to provide in contact with the skin an interconnected cellular formation.

"3. As an article of manufacture, a one-piece deposited latex supporting girdle formed of constricting walls, comprising a constricting front portion and a constricting back portion each formed as normally flat areas the sides of which substantial-

ly conform to the outlines of the lower female torso as viewed from the front or back, and narrow areas extending along each side of the girdle, said latter areas being formed with a smoothly curved outwardly convex substantially uniform cross section and serving to integrally join the corresponding sides of said front and back portions and smoothly merging therewith, a readily stretchable narrow crotch area of the deposited latex, extending as a continuous and integral connection between the lower central regions of said front and back portions, the edges of the front of said crotch area extending upwardly and gradually outwardly to merge with and form the lower edges of the middle front portion of the girdle from whence said edges continue outwardly and downwardly to the region of said side areas of the girdle, thereby forming curvilinear cut-out areas at each side of the lower middle front portion, the upper margins of said cut-out areas substantially conforming with the line of juncture of the upper thighs and body of the wearer and said cut-out areas also increasing the effective length of said stretchable crotch area, said crotch area also being shaped and of a length to extend down substantially below the lower margin of the back portion when the girdle is in flat position."

"6 An integral one-piece supporting girdle formed of deposited latex of a strength and shape throughout to apply generally uniform constrictive force to the flesh around the lower torso of the wearer, the front and back areas being formed with 'pin-point' perforations distributed thereover, and the inside surfaces of the latex being of a slightly roughened matted character."

5. Latex is a milky fluid, other than sap, procured by tapping a tree, *hevea brasiliensis*, grown largely in Africa and in the Far East.

6. Rubber as used commercially in manufactured articles in this country prior to 1920 was made from masticating (usually by milling) crude rubber stock, into which was mixed certain compounding ingredients. Crude rubber was derived in turn from latex by diluting the latex, coagulating it with acid and then pressing, masticating, washing and drying the spongy coagulum. These processes are still in use today.

7. Crude rubber may be intensely masticated and dissolved in a hydrocarbon to produce a solution which may, among other uses, be used to produce dipped rubber goods.

8. About 1920, improvements in preservation and transportation techniques made latex, as distinguished from crude rubber, available in commercial quantities in this country.

9. For this purpose the milky latex gathered at the tree is treated with preservatives, usually ammonia, a stabilizing chemical is added and, thereafter, it is to some degree concentrated. After adding compounding ingredients for curing and coloring and acceleration and after deaeration, the latex may be used directly for making articles by dipping.

10. In dipping, a form or mold in the shape of the object to be produced is lowered into a tank containing the liquid latex. Upon drying, the solution deposits a film of latex on the form about .003 to .005 inches thick. By repeated dipping the film may be built up to the desired thickness.

11. By this process many articles such as gloves, nipples, tobacco pouches, balloons, rubbers and sheeting are made. Latex thread is also produced from liquid latex.

12. Articles made from latex dipping are superior to articles made from crude rubber or a crude rubber solution. The steps preliminary to dipping and the dipping are simpler and less complicated and the resulting products have a

higher tensile strength and do not tear as easily; they also last longer.

13. For centuries women have used constricting garments of various kinds to control and shape their figures. During the first two decades of this century the garments most generally used for this purpose were corsets produced in many shapes and varieties but which generally confined the body of the wearer from just below the bust to below the hips. Such garments were made for the most part of fabric, made rigid by steel or bone stays, and were typically hooked or laced, or both.

14. A girdle is a woman's close-fitting undergarment, either lightly boned or boneless and partly or wholly of elastic fabric, extending from just below the waist to below the hips. A girdle with a crotch piece is known in the industry and commercially as a "panty girdle".

15. From 1920 to the present time the corset and girdle industry has been aware of a continuing demand on the part of women for simpler, less restrictive and more comfortable garments which would provide the desired constriction and control of the female form to achieve the contour of figure commonly accepted at the time as desirable.

16. Prior to 1950 in this highly competitive industry, efforts were made to meet this demand by making corsets and girdles of various combinations of fabrics and rubber or latex sheeting, and most acceptably, by making girdles from material woven from latex filaments wound with fabric thread. In the 1930's this product became and is still known as the "two-way stretch girdle".

17. Although for at least ten years prior to Spanel's application for the patent in suit on June 26, 1940, the resources of the latex art were sufficient to produce a seamless dipped latex girdle, no one else within that period had conceived of a seamless dipped latex girdle. The closest prior use of latex in the girdle industry is disclosed by the patent issued to Young and Hemm, No. 1,923,-524 (1933). This patent suggests making perforated material for girdle panels or corset panels by dipping in latex a mold, the shape of which is not described. The Young and Hemm patent teaches cutting the dried deposit around the edges of the mold to produce two similar sheets of perforated latex, one from each side of the mold.

18. The invention disclosed by the Spanel patent was an integral one-piece girdle of deposited latex "of a strength and shape throughout to apply constrictive force to the flesh around the lower torso of the wearer".

19. The Spanel girdle has .substantially uniform stretch capacity in all directions.

20. The patented product supports and constricts the wearer's torso, giving a firm, slimmed appearance, without markedly restricting freedom of movement.

21. Girdles having seams may leave impressions on the skin of the wearer which the seamlessness of the Spanel girdle avoids.

22. Seamlessness also avoids any interruption of the stretch capacity of the material, and thus the material is enabled uniformly to perform its constricting function.

23. The seamlessness and the smooth outer surface of the patented product allow outer garments to slide smoothly over the girdle without catching or riding up, and make the girdle imperceptible beneath the outer garment.

24. The patented product may be hand-washed and dried with a towel in a matter of minutes, while girdles made of fabric and elastic thread take considerably longer to dry.

25. The patented product is cheaper to manufacture and can be sold for less than many competing girdles.

26. Since latex stretches in all directions and is adaptable to variations in the shape and size of the wearer, the patented product may be made commercially in fewer sizes than other girdles, thus permitting economical manufacture and

avoiding the necessity of retailers' carrying large inventories.

27. The range of thickness described in the patent—from .016 inches to .030 inches—is thick enough to constrict and shape the body and to resist attack by body secretions and yet is thin enough to be donned and removed readily.

28. The use of a roughened or matted inner surface in some measure channels moisture toward the perforations to assist in evaporation and cooling.

29. The plaintiff first marketed the Spanel girdle early in 1940. At that time, and until 1951, the product marketed by the plaintiff was the Spanel girdle, with and without the crotch piece, having perforations and a smooth exterior as its only preferred features. The inner surfaces were smooth rather than of a roughened matted character.

30. Nonetheless, the plaintiff's product achieved immediate and rapidly-growing acceptance. Its sales have been:

| Period | Units | Dollars |
|---|---|---|
| 11/1/39 to 10/31/40 | 488,000 | $    576,000 |
| 11/1/40 to 10/31/41 | 896,000 | 1,216,000 |
| 11/1/41 to 10/31/42 | 271,000 | 414,000 |
| 11/1/46 to 10/31/47 | 2,200,000 | 5,093,000 |
| 11/1/47 to 10/31/48 | 1,587,000 | 3,673,000 |
| 11/1/48 to 10/31/49 | 2,289,000 | 5,516,000 |
| 11/1/49 to 10/31/50 | 3,996,000 | 10,631,000 |
| Total | 11,727,000 | $27,119,000 |

31. The success of the plaintiff's girdle was attributable to public demand for the product.

32. The girdle described and taught by the Spanel patent is novel and useful.

33. The differences between Spanel's concept and the prior art were not such as to be obvious at the time to a person having ordinary skill in either the girdle art or the latex dipping art.

34. In view of the numerous sales by the plaintiff of its seamless dipped latex girdle, there was a continuing inducement for companies engaged in the highly competitive field in making girdles and those engaged in latex dipping to copy the plaintiff's product. There is no evidence of any such companies making such copies up to October, 1950. Thereafter, up to the time of the commencement of this action, copies appear to have been made by the American Wringer Company, Inc. which, after objections by the plaintiff, made a licensing agreement with the plaintiff. In addition, similar girdles were made by one Rosenberg and his Circle Products Company in 1954, and in 1955 that Company began making them for the defendant. There was some inconclusive evidence that sales of seamless dipped latex girdles called Hollywood and Diana, and others made by the Pilgrim Rubber Company may have been made about the time of the bringing of the present action.

35. The defendant became aware of the plaintiff's product shortly after the marketing and advertising of it began in 1940.

36. With plaintiff's resumption of the manufacture and sale of its seamless dipped latex girdles following World War II, the defendant became aware of the plaintiff's rapidly increasing sales of the girdle. It became apparent to the defendant that the plaintiff's product was filling a substantial percentage of the demand of the market for girdles.

37. About 1950 the defendant commenced investigations and experiments to produce a girdle which would compete effectively with the plaintiff's product.

38. At the end of April, 1954, the defendant decided to have manufactured on its behalf several hundred seamless dipped latex girdles which were then being made by Circle Products Company in Brockton, Massachusetts.

39. The defendant, through its officers, had studied the features of the girdle being made by Circle Products Company and had consulted with defendant's counsel concerning possible infringement of the plaintiff's patent, of which the defendant was aware.

40. The defendant in good faith decided that the seamless dipped latex girdle being manufactured by Circle Products Company would be satisfactorily competitive with plaintiff's product and, on the advice of counsel that the Circle Products Company girdle did not infringe the plaintiff's patent, ordered several hundred of said girdles from the Circle Products Company. The defendant began marketing these girdles in March, 1955, about eight months after the commencement of the present action. The girdles then placed on the market included the accused girdles Exhibits 201A, 201B, 201C and 201D.

41. The accused girdles are similar to the plaintiff's patented product under Claims 1, 2 and 6 of the patent, except for the character and composition of the inside of the girdle, in that they are integral one-piece supporting girdles formed of deposited latex sheet material; that they are of similar strength and shape; that their external surfaces are smooth, and that they have front and back areas formed with pin-point perforations, ranging from .009 inches to .0031 inches, distributed thereover.

42. The preferred forms described in Patent Claims 1, 2, and 6 call for internal surfaces of the deposited latex sheet material of a slightly roughened or matted character. The patent claims call for a roughening or matting of the surface of the latex material itself and not of some other material attached to said surface.

43. The accused girdles differ from the plaintiff's patented girdle as described in Claim 1, 2, and 6, in that they are "flock lined", i. e. through a prior art process, fine particles of fabric such as cotton, rayon, wool or other similar material are applied to the latex of the inside surface of the girdle.

44. Flock is not the same as a roughened latex surface. Flock on a latex surface next to the skin of the wearer has an effect different from that of a roughened latex surface, being softer, smoother, more comfortable, more water absorbent and easier to put on and take off. It does not stick to the skin.

45. No latex girdle using a roughened latex surface next to the skin has ever been manufactured and sold by the plaintiff or the defendant or anyone else. Except for some latex girdles made and sold by the plaintiff which are of smooth surfaces inside and out all latex girdles made by the plaintiff and defendant since 1950 use flock next to the skin, although flocking is more expensive and more difficult to apply.

46. The accused panty girdles, Exhibits 201A and 201B, having integral crotch pieces, conform substantially to the panty girdle described in Claim 3 of the Spanel patent.

47. These accused articles have a readily stretchable narrow crotch area made of deposited latex extending as a continuous integral connection between the lower central regions of the front and back portions, and the front of said crotch extends upwardly and gradually outwardly to merge with and form the lower edges of the middle front portion from which said edges continue upwardly and downwardly to the region of the side areas of the panty girdle.

48. The cut-out portions so formed in the front of the panty girdle conform in general with the juncture of the upper thighs and the body of the person wearing it. These cut-out portions increase the effective length of the crotch area.

49. Although the crotch area does not extend down substantially below the lower margin of the back portion when the girdle is in a flat position, the defendant's

girdle has substantially the same length crotch piece. This results from the higher curvilinear cut made for the top of the leg openings, and a slight bringing forward of both leg openings.

50. Placed on the female body, the accused articles behave in substantially the same way and serve the same functions and purposes as the girdles illustrated in Figs. 1, 4 and 7 of the patent in suit.

### Conclusions of Law.

1. The court has jurisdiction of the subject matter and the parties in this action.

2. U. S. Patent No. 2,360,736 issued to A. N. Spanel on October 17, 1944 for a seamless dipped latex girdle is a valid patent.

3. Said patent was assigned by A. N. Spanel to the plaintiff, who is the present owner of said patent and all rights to recover for any infringements thereof.

4. The broad inventive concept underlying the validity of the patent is a seamless one-piece integral girdle made of deposited latex.

5. The patent does not grant a monopoly for the entire, broad inventive concept; the patent grants a monopoly only for the inventive concept as it is practiced and used in each of the preferred forms described in Patent Claims 1, 2, 3 and 6.

6. The subsidiary features of Claims 1, 2 and 6 (i. e. those outside of the broad concept) while useful, are not novel in themselves.

7. With respect to these claims the invention necessary for their validation is found in the broad concept of the integral one-piece supporting girdle of deposited latex. The invention of the broad concept likewise supports the validation of the preferred form described in Claim 3, except that the subsidiary feature of that claim, i. e. the integral crotch therein described is, in itself, novel and useful.

8. The doctrine of equivalents does not apply to the use of flocking on the inside of a seamless dipped latex girdle in lieu of a roughening or matting of the surface of the latex material itself.

9. The accused girdles, Exhibits 201A through 201D, do not infringe Claims 1, 2 and 6 of the patent in suit.

10. The long crotch area in the accused girdles, Exhibits 201A and 201B, is the equivalent of the long crotch described in Claim 3 of the patent.

11. The accused girdles, Exhibits 201A and 201B, infringe Claim 3 of the patent in suit.

### Discussion.

On October 17, 1944, the plaintiff's assignor, A. N. Spanel, was issued patent No. 2,360,736 on a seamless dipped latex girdle. He had filed the application for the patent June 26, 1940. The issues before the court are whether or not Claims 1, 2, 3 and 6 of the patent are valid and, if they are, whether or not one or more of them are infringed by latex girdles sold by the defendant. Title to the patent in the plaintiff is not disputed.

On the question of validity, consideration will first be given to the matter of invention. Prior to 1940, in the effort to get away from the rigors of corsets with their steel and bone stays, the girdle art had made use of latex in two general ways: one was the use of latex panels attached to textile fabric sections of the garment; and the other was in making girdles of woven latex thread covered by a winding of cotton, rayon or other textile fiber thread. These became known in the trade as "the two-way stretch" girdles. The closest approach to Spanel's concept appeared in a patent issued to Young and Hemm, 1933, which suggests making perforated latex sheeting for corsets by dipping in latex a mold, the shape of which is not described, and then, after drying, cutting the deposit around the edges of the mold to produce two similar sheets of perforated latex—one from each side of the mold. While it suggested the use of such perforated sheets in making corsets, it did not teach or suggest making a seamless, dipped latex girdle.

By 1940 many kinds of latex dipped articles, such as surgeons' gloves, baby

pants, balloons, bathing caps, hot water bottles and rubbers, were being made and sold. However, in spite of the continuing demand by women for a single, simple garment, inexpensive and easily cared for, which had the strength and shape to constrict and control their lower torsos in such a fashion as to enhance their figures according to accepted standards of the day and which was at the same time comfortable and practical, and in spite of the constant search among the competing members of the industry for means to meet this demand, no one, prior to Spanel, conceived of an integral one-piece supporting girdle formed of deposited latex.

While a presumption of validity derived from the granting of the patent is not indispensible to the decision reached in this case, the defendant has produced no persuasive evidence to rebut the conclusion that the Patent Office recognized invention in Spanel's broad concept. If it did not find invention there, it would not have found invention at all. Assuming arguendo, no invention in the broad concept, it would then become highly unlikely to suppose that invention was found in a combination of the broad concept with the special features characterizing each of the preferred forms (with the exception of Claim 3). Roughening of the inside surfaces and pin-pointing were very old art, and the use of either of them in combination with the broad concept would be readily obvious to any one having even a passing acquaintance with either the girdle or latex dipping arts.

The seamless dipped latex girdle offered by Spanel was novel and useful, and the differences between it and the prior art were not such that Spanel's concept was obvious at the time to a person having ordinary skill in the girdle art or the latex dipping art. There was immediate and constantly increasing public acceptance of the Spanel girdle once it was put on the market. The number sold, except for disruption by World War II, went from approximately 500,000 during 1940 to approximately 4,000,000 during 1950. The girdles sold during this decade were of seamless dipped latex, with perforations, but of smooth unroughened latex, inside and out. It should be noted that these girdles did not come within the monopoly granted by the patent as hereinafter discussed, and anyone could have and still can, make them. The large sales of them, however, is evidence of public demand and acceptance of the broad concept, thus showing invention.

While there was invention in Spanel's concept, the monopoly granted by the patent is much more narrowly defined. Of course, each claim found to be valid is a separate patent monopoly, and the claim is the measure of the grant. Smith v. Snow, 1935, 294 U.S. 1, 11, 55 S. Ct. 279, 79 L.Ed. 721. The fact that Spanel acquiesced in the cancellation of broad claims embodying his invention and accepted much more limited grants of monopoly as set out in the claims of the finally approved and issued patent, does not constitute a disclaimer on his part of the novelty of the broad concept. Invention is a feature which is still to be considered, but only as it may apply within the limited boundaries of the claims of the patent and in connection with the preferred forms set forth therein. International Cellucotton Products Co. v. Sterilek Co., 2 Cir., 1938, 94 F.2d 10, 12.

The grant confines the monopoly under Claims 1 and 2 to specific forms: in Claim 1, the external surfaces of the deposited latex sheet material are specified to be smooth and the internal surfaces of the deposited latex sheet material are of a slightly roughened or matted character for contact with the skin of the wearer; in Claim 2, the internal surfaces of the deposited latex sheet material are specified to be of a matted character and such as to provide in contact with the skin an interconnected cellular formation. Even though there is nothing novel about making the surfaces of the deposited latex sheets roughened or giving surfaces of such material a matted character as described, the invention, limited to a form incorporating the prior art of

roughening and matting, makes valid Claims 1 and 2 of the patent. On the issue of infringement, however, there is no evidence that the defendant, or, for that matter, the plaintiff, ever made or sold a girdle in the forms described in these two claims, and it therefore does not appear that the defendant has infringed Claims 1 and 2. The plaintiff asserts the contrary by interpreting the words "roughened matted character" and "matted character", as applying not only to a roughening or matting of the deposited latex material itself, but as including any kind of alien material attached to the surface of the deposited latex, such as flocking which is used by both plaintiff and defendant in the girdles actually made and sold since 1950. But the wording of the claims can admit of no such construction. Each claim concerns "deposited latex sheet material" and this is what is referred to when the claims speak of "surfaces of said sheet material" and "surfaces thereof", phrases omitted by the plaintiff in quoting from or paraphrasing Claims 1 and 2 in its draft findings and briefs. The specifications, in using the term "connecting-cellular" with reference to the roughened inner surface, are talking about "this latex material". The plaintiff has presented no convincing evidence that Spanel had anything in mind beside roughening the surface of the latex itself. It does not appear either from the language of the patent or any outside evidence that he intended to suggest the use of flock or any other addition to the internal surface of the girdle. Especially where the patentee claims a monopoly narrower in scope than his full disclosure, the statement of claims must be strictly construed. Helene Curtis Industries Inc. v. Sales Affiliates, Inc., 2 Cir., 233 F.2d 148, 160, certiorari denied 1956, 352 U.S. 879, 77 S. Ct. 101, 1 L.Ed.2d 80.

The plaintiff also invokes the doctrine of "equivalents", which is that "if two devices do the same work in substantially the same way and accomplish the same result, they are the same, even though they differ in name, form or shape". Union Paper-Bag Machine Co. v. Murphy, 1877, 97 U.S. 120, 125, 24 L. Ed. 935; Sanitary Refrigerator Co. v. Winters, 1929, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147. It is true that where "an infringer has attempted to appropriate the essence of the invention while remaining outside the language of the claims, courts have not hesitated to apply the doctrine of equivalents, whereby the 'essence' of the invention is protected". See Georgia-Pacific Corp. v. United States Plywood Corp., 2 Cir., 1958, 258 F.2d 124, 137.

But this is not a case where the patent protects the whole invention; the broad claim was limited to acquire a very narrow monopoly, and the plaintiff cannot now seek to broaden that monopoly by expanding the meaning and application of the terms of the claims. I. T. S. Rubber Co. v. Essex Rubber Co., 1926, 272 U.S. 429, 444, 47 S.Ct. 136, 71 L.Ed. 335. "Flocking", the method and means by which both plaintiff's and defendant's seamless latex girdles are now lined, is an old art, no longer under patent monopoly; and the public has a right not to have this important use brought within monopoly restrictions through broad interpretations of the language of the patent claims. For the ostensible purpose of protecting that version of the invention which lies within the narrow confines of the claim, means should not be used which actually result in a broadening of the monopoly granted by the patent. The doctrine of equivalents should not be applied under these circumstances. Moto-Mower Co. v. E. C. Stearns & Co., 2 Cir., 126 F.2d 854, 856; Stelos Co., Inc. v. Hosiery Motor-Mend Corp., 2 Cir., 1934, 72 F.2d 405, 407.

Moreover, even if the doctrine were not ruled out as a matter of law, "flocking" as used in the accused girdles is not in fact the equivalent of the roughened or matted internal latex surfaces of the girdles as described in the patent claims. The plaintiff offered no convincing proof that a seamless dipped latex girdle, flock lined, was the equivalent of the same girdle with the latex of the inside sur-

face of the girdle roughened or matted as described in the patent claims. It appears that the latter was of so little use and so slight an improvement over the smooth latex surfaces that no girdles incorporating its use were ever made by the plaintiff or anyone else; and all of the girdles made and sold by the plaintiff up to 1950 had smooth surfaces inside and out. After that time the plaintiff's girdles as well as the defendant's accused girdles have been flock-lined. From the evidence on the subject it appears that flocking on the inside surfaces of latex girdles is greatly superior to either the smooth latex surfaces or the roughened or matted latex surfaces from the point of view of the comfort of the wearer; flock is softer, smoother, more absorptive and makes the girdle easier to put on and take off, because it does not stick to the skin. Thus it can achieve more than the roughened or matted latex surface of the patent claims and therefore cannot be the equivalent. Moto-Mower Co. v. E. C. Stearns & Co., supra. While a sample of sheet latex may be made up with a roughened or matted surface which, to casual inspection, may appear similar to a sample made up with a lightly flocked surface, for the purpose of use as the inside surface of a girdle, flocking is not the equivalent of a roughened or matted latex surface. Flocking is more difficult and more expensive than the process of roughening contemplated by the patent, and it is reasonable to suppose that, if the latter were the equivalent, it would have been used in this highly competitive business; but it was not.

Therefore, the defendant cannot by application of the doctrine of equivalents, be found to have infringed Claims 1 and 2.

Claim 3 of the patent concerns a one-piece deposited latex girdle with an integral, readily stretchable narrow crotch piece of deposited latex of a shape and length to extend down substantially below the lower margin of the back portion of the girdle when the girdle is in a flat position.

Under this claim the preferred form of the invention is limited in its monopoly grant to one having a crotch piece added but as an integral part of the one-piece seamless dipped latex girdle. While novelty and usefulness are not necessary as preliminary findings to a conclusion of infringement, this feature is, in itself, novel and useful. The Barnes patent No. 2,125,482 is readily distinguishable, for it is limited to a fabric crotch piece, fastened to the bottom of the front and back of a girdle, and is removable. Barnes does not teach or suggest a crotch as an integral part of a seamless one-piece dipped latex girdle, with the accompanying convenience and uses set forth in the specifications of the patent and which are not attributes of the Barnes crotch piece.

Nor does Spanel No. 2,086,481, the patent on a form of dipped sheet latex baby pants teach a one-piece dipped latex girdle with integral crotch, because the functions, purposes and design of the sheet latex between the leg holes of the baby pants are not the same as the crotch piece of the panty girdle.

The defendant's accused girdle is similar, except that when it is in a flat position, the crotch piece seems to be shorter than that of the patented girdle and the leg openings are of slightly different shape. The defendant urges that these differences are sufficiently significant to prevent a finding of infringement of Claim 3. The defendant seeks to distinguish the girdles by describing its accused garment as having a *short* crotch piece and the patented garment as having a *long* crotch piece. An actual comparison of the two girdles, however, does not reveal any justification for the use of strongly contrasting adjectives. While the different shaping of the lower margin of the back portion of the defendant's girdle makes the folded crotch area appear a little shorter than the same area in the plaintiff's girdle when both of the girdles are in a flat position, the effective length of the stretchable crotch area in each of the plaintiff's and defendant's garments is the same. In each of the

garments the crotch area performs the same functions in substantially the same ways. It must be concluded that the differences are so minor as to be of no practical significance, and that, consequently, the defendant's accused girdles (Exhibits 201A and 201B) infringe Claim 3 of the patent. See Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 608–610, 70 S.Ct. 854, 94 L.Ed. 1097; Sanitary Refrigerator Co. v. Winters, 1929, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147; 1 Walker on Patents, Section 424 (6th Ed. 1929).

Claim 6, the only other claim involved in the issues of this case, derives its inventiveness from the broad concept of an integral one-piece deposited latex girdle. It is a valid grant limited to the preferred form of that girdle having two special characteristics: i. e. "pin-point" perforations distributed over the front and back areas *and* inside surfaces of the latex "being of a roughened matted character".

The remaining question is whether the defendant's accused girdles infringe this grant. It is obvious that they do not. The inside surfaces of the latex in the accused girdles are not of a roughened matted character but are flocked. For the reasons given in connection with the same question which arose under Claims 1 and 2, this does not constitute infringement nor does it justify the application of the doctrine of equivalents. Pin-pointing alone does not constitute infringement as long as the inner surfaces do not infringe. The seamless dipped latex girdle with smooth inside and outside surfaces actually made and sold by the plaintiff prior to 1951 had the pin-point perforation; and, as the plaintiff conceded in his final reply brief, "the defendant could have made girdles identical with those which plaintiff marketed so successfully until 1951 * * *." The plaintiff did not specifically mention perforations and was, in fact, pointing-up the characteristic of a smooth inner surface as distinguished from a roughened or matted latex inside surface; but pin-point perforations are only one of the two special

characteristics of the monopoly granted under Claim 6 and the use of one of them only would not constitute an infringement of Claim 6 of the patent.

Judgment may enter for the plaintiff against the defendant decreeing the validity of Patent No. 2,360,736, for the plaintiff to have an accounting for damages and its costs because of the defendant's infringement of Claim 3 of Patent No. 2,360,736 and for a permanent injunction against the defendant and all those in privity with it from further infringing Claim 3 of said patent. The issues concerning those portions of the complaint which charge infringement by the defendant of Claims 1, 2 and 6 of said patent are adjudged in favor of the defendant and as to those charges the complaint is dismissed.