**DIAMOND INTERNATIONAL CORPORATION, a corporation of Delaware,**

v.

**MARYLAND FRESH EGGS, INC., a corporation of Maryland.**

**Civ. A. No. 20809.**

United States District Court,
D. Maryland.

April 25, 1974.

John W. Avirett, II and Paul V. Niemeyer, Baltimore, Md., Karl W. Flocks and Sheridan Neimark, Washington, D. C., and Sumner S. Kittelle, New York City, for plaintiff.

Benjamin C. Howard, Baltimore, Md., Truman A. Herron and Herbert C. Brinkman, Jr., Cincinnati, Ohio, for defendant.

WATKINS, Senior District Judge.

This is an action brought by Diamond International Corporation (hereinafter sometimes "Diamond" or "Plaintiff") against Maryland Fresh Eggs, Inc. (hereinafter sometimes "MFE" or "Defendant") for alleged infringement of United States Patent 2,990,094 (Reifers '094) issued June 27, 1961, on a continuation of a copending application filed December 16, 1953, which was in turn a continuation-in-part of an application filed May 24, 1952, for a "Molded Pulp Egg Carton." It is a product patent.

The Patent Office has determined that Reifers '094 is entitled to the filing date of May 24, 1952.

Dolco Packaging Corporation (hereinafter sometimes "Dolco") by agreement dated June 26, 1969, undertook to save MFE harmless with respect to Diamond's claim in this action; its defense is open and avowed; and it has engaged and is paying the (very able) attorneys who are defending MFE.[1] It is jointly owned by Olson Brothers, Inc. (hereinafter sometimes "Olson") and Dow Chemical Company (hereinafter sometimes "Dow"), neither of which is a party to this suit.[2]

Jurisdiction and venue are admitted and were established.

In Diamond International Corporation v. Walterhoefer, 289 F.Supp. 550 (D.Md. 1968) (hereinafter "Walterhoefer"), the author of this opinion held Reifers '094 to be valid and infringed.[3] No appeal was effected to the United States Court of Appeals for the Fourth Circuit.

Plaintiff, of course, contends that the *Walterhoefer* decision is controlling. Defendant (equally), of course, contends that it is not. In general, Defendant urges that the decision in *Walterhoefer* was probably wrong, but that even if it were not, subsequently developed additional information, including additional patents; later decisions with respect to combination patents and fraud on the Patent Office; and the physical and geometrical properties of the accused structure should now lead to a different result. Alternatively, Defendant contends that Reifers '094, if valid, is so limited that it does not read on the accused device. Plaintiff counters that the accused device is the equivalent of that claimed in Reifers '094.

This litigation also has been vigorously contested.[4]

---

1. Pretrial Order (hereinafter P/T) filed March 23, 1971, par. 4.

2. P/T, par. 21. Olson and Dow were originally joined as defendants. Dow's motion to dismiss was granted, and the Olson litigation was transferred.

3. Since Walterhoefer was thoroughly litigated (See 289 F.Supp. at 551, footnote 1) frequent references will be made thereto, with some quotations therefrom.

4. In addition to the usual pre-pretrial and pre-trial conferences and orders, all preceded by voluminous briefs and fully argued, there was a trial of thirteen court days; two days were spent visiting the plants of Plaintiff and and Defendant, and half day in an abortive effort to visit a packaging plant; one day on Plaintiff's motion to reopen the case; and a full day on final argument. In the trial a total of 235 Plaintiff's exhibits and 158 Defendant's exhibits were filed; and after the

The claim in suit read as follows:

"1. In an integral and nestable egg carton made of relatively flexible molded pulp, a cellular tray portion having a front side, a rear side, and two ends, an inverted dished cover hinged to said tray portion, means for latching said tray portion to said cover with a latch located above said tray portion and extending completely through said cover from the inside to the outside, said tray portion having its front side strongly tied to its rear side by a plurality of spaced cell-forming partitions extending generally parallel to said tray portion ends, said partitions acting as means for preventing spreading of said front side from said rear side, said tray portion including egg cells adjacent but below the latching means, said inverted dished cover having a planar top, a front side, a rear side, and two ends, said front side being connected to said rear side only by said two ends and said planar top so that the front side is relatively flexible and is not rigidly tied to said rear side intermediate the ends of said front side of said cover having an opening formed therein through which the latch is adapted to extend completely from the inside to the outside, said dished cover being hinged to said tray portion along its rear side, a latch holding flap hinged to the front side of said tray portion, the hinge line connection of said cover with said tray portion and the hinge line connection of said latching flap with said tray portion being maintained parallel by said tying partitions even when the tray portion is loaded with eggs, said latch on said latching flap being located on one side of said tray portion which is opposite to the side where the cover is connected to the tray portion so that both the cover and the latching flap are each connected to the tray portion when the carton is open, said molded pulp egg carton being integrally formed with the latching flap, the upper edges of the two sides and the two ends of the tray portion, the upper edges of the two sides and two ends of the cover generally in the same plane and with the latch extending downwardly from the underside of the latching flap which is hinged to the front side of the tray portion and said latch being relatively close to the tray portion as compared with the opening in the front side of the cover which is relatively remote from the tray portion; when the tray portion is loaded with eggs and the latching flap is turned upwardly and the cover portion is rotated in a direction to telescope over the latching flap, the two hingelines are relatively immovable but the front side of the cover may flex, whereby the loaded egg carton may be latched by simply rotating the latching flap upwardly and inwardly and rotating the cover upwardly and around the latching flap while the structural features maintain the geometric relation of the latch on the latching flap to the opening in the cover until the front side of the cover engages the latch on the latching flap and is cammed thereover until the latch on the latching flap registers with the opening in the front side of the cover whereupon the latch passes through the opening in the cover from the inside to the outside to effectively latch the carton.

"2. A nestable molded pulp egg carton in accordance with Claim 1, wherein the opening in the front side wall of said cover extends to the planar portion thereof and the latch on said latching flap is near the edge thereof which is remote from the hinge connection of the latching flap with the tray portion."

trial, briefs of over 800 pages were filed, taking only Foreward and Text. If the instances in which a numbered page was faced by an unnumbered page, and if the appendices, were added, the total would well exceed 1000 pages.

## FORMATION OF CARTONS

Plaintiff's cartons are integrally [5] produced by a process of secretion of liberated wood or waste paper fibers, by suction imposed within a die of desired configuration, upon the exterior of the die. Defendant's cartons are [6] of foamed polystyrene. The process begins with solid polystyrene in bead form. The beads are thermoplastic, and become a fluid consistency as heat is applied externally to an extruder. A gas (Freon) under high pressure is charged into the molten polystyrene in the extruder and diffuses into the polystyrene. Subsequently, the mass is partially cooled under the maintained pressure, and the mass is squeezed or extruded continuously out of a narrow circular annulus into the atmosphere in the form of a tube.

Upon release of pressure on extrusion, the diffused gas, aided by the prior incorporation of a nucleating agent, forms a myriad of tiny bubbles in the tube.

The tube passes over a cooled mandrel which expands the diameter of the tube and coincidentally causes the tube material to be stretched circumferentially, building what is called transverse axial orientation into the material and strengthening it. Coincidentally the tube is subjected to longitudinal stretch by means of pull rolls, which also improves the toughness of the material.

The moving tube is slitted longitudinally by a stationary knife at a point beyond the stretching mandrel. The slitted tube is then laid open as a continuous flat sheet and is rolled upon itself as roll stock.

To make an egg carton, the flat sheet material fed from the roll is led to a thermoforming machine in which it is gradually reheated to render it thermoplastic, but without bursting the contained bubbles. When suitably thermoplastic, a length is advanced to a position between chilled or cooled dies having non-porous mating faces of the desired egg carton shape. These dies, brought toward one another, deform the sheet. The cooled dies cool the thermoplastic sheet material so that it becomes immobilized.

The next step is the punching of holes or apertures in the cover for the reception of lugs formed by the dies.

Finally, the excess marginal portions of the sheet are trimmed by cutting dies which separate the formed cartons from the sheet margins. The trimmings and aperture punchings are reground and recharged to the extruder.

The Court's comments by way of partial summary were as follows:

"It seemed to me that the physical and mechanical procedures at Palmer [7] and Lawrenceville were quite different, although each seems to involve a molding process. Palmer is a molding by agglomeration of disassociated particles, which are then dried and sometimes pressed, and in that sense, perhaps, thermo-refined. (Tr. p. 600).

"The molding at Lawrenceville is accomplished by softening sheets, then forming cartons by dies 'deforming' the flat sheets . . . (Tr. p. 600).

"I also noticed as we were coming up that there was some differentiation. In Palmer, a defoamer is inserted, while at Lawrenceville, a foam generator is considered to be indispensible." (Tr. p. 603)."

## VALIDITY

Defendant urges that the decision in *Walterhoefer* is not controlling, on a number of grounds:

■ 1. Koppelman Patent No. 2,-093,280, issued September 14, 1937, on application filed December 6, 1934, for "Self-Locking Carton and Packing."

---

5. Although the carton is "integrally" molded, some "after pressing" is regularly used.

6. The Court has closely followed the description in Defendant's Main Brief After Trial, pp. 25–28.

7. The plants visited were Plaintiff's in Palmer, Massachusetts, and Defendant's in Lawrenceville, Georgia. Each has plants at other locations.

a. In *Walterhoefer*, Koppelman was urged as a defense under 35 U.S.C. Section 103—obviousness. In this case the Defendant vacillates in its briefs from a claim of anticipation under 35 U.S.C. Section 102, to anticipation under Section 103 if coupled with another patent, or other patents. However, in the final arguments Defendant admitted,[8] albeit reluctantly, that Koppelman was not an anticipation.

Koppelman was fully and carefully considered in *Walterhoefer* (289 F.Supp. 559–561) and by the Patent Office Board of Appeals (289 F.Supp. 561), and the argument repeated here, was rejected that the results of Reifers could be reached simply by inverting Koppelman.[9] As was pointed out in *Walterhoefer*, Koppelman stressed and relied upon the weight and pressure of the eggs in effecting and maintaining the closure of the carton as described in the patent. The court stated (289 F.Supp. 561):

"Certainly gravity could not be inverted with the inversion of the carton, and 'weight and pressure of the articles in the carton' could *not* be employed in part to hold the closure."

The Court is unaware of any relevant change in the operation of the laws of gravity since the *Walterhoefer* decision.

b. This Court also stated in *Walterhoefer* (289 F.Supp. 560) that:

". . . there was no evidence that Koppelman '280 had ever been constructed, or that any one had ever seen a physical embodiment of such a structure, . . . although there was uncontradicted affirmative evidence that it could not be commercially made, and if made would be inoperative . . ."

It is not believed that Defendant challenges the accuracy of that statement on the basis of the record before the Court at the time it was made. Defendant does claim that subsequently discovered evidence shows "that a molded pulp carton having cooperative lugs and apertures was made commercially according to the disclosure and teachings of Koppelman . . ."[10] This is based upon the testimony of Ralph A. Farnham, and the exhibits produced by him.

Because Defendant's position as to newly discovered evidence is based solely upon the testimony of Farnham, and because the Court was initially misled by Farnham's testimony,[11] his testimony in court, and subsequently by way of deposition[12] will be summarized in more than usual detail.

In his direct examination in court, Farnham testified that until his retirement some twenty-five years ago[13] he had been in charge of manufacturing at the Herkimer, New York plant of International Paper Company, under Read, General Manager. Among other things, it produced molded pulp egg "flats".[14] He produced a carton made at Herkimer about five weeks before trial. (Defendant's Exhibit 94). He testified that he became familiar with the Koppelman "patent"[15] in 1934–35, "and then we put it on the machine, the latter part of 1937 . . ." (Tr. p. 2025). "This happens to be an egg carrier of personally my own design . . ." (2026).

8. Tr. p. 2373.

9. *See* Block v. Nathan, 9 F.2d 311 (2 Cir. 1925), cited in Cowles Co. v. Frost-White, 174 F.2d 868 (2 Cir. 1949).

10. Defendant's Main Brief After Trial, pp. 42–43.

11. It is unnecessary to determine whether or not the Court was originally too trusting, or whether Farnham deliberately pitched a plausible argument upon half or full non-disclosures.

12. The case being reopened for this purpose.

13. He was seventy-five years old at the time of the trial.

14. A word used by Farnham as descriptive of any egg container, whether in the form of a carton, or tray for insertion into a sleeve. The more accurate trade terms are discussed at page 551 in 289 F.Supp.

15. Issued September 14, 1937, on application filed December 6, 1934.

It related to figures 1, 2 and 5 of the Koppelman patent (2025).[16]

To manufacture Defendant's Exhibit 96, Farnham "went to the paper mill in Herkimer and dug up one of the old dry [17] heads that I used years ago on the machine." (2028).

In explaining how the dry head was used, Farnham testified:

"Q. And how did you use it?

"A. We put fine wire, we stretched fine wire over the dry head and in order to do that we had to anneal it, of course, three times, and after we put it on we sewed it on with fine threads, then we fastened it on to a wooden suction box, the head, itself, with a suction hose on the back. We turned it over and stuck it down into a vat of moving pulp which we kept agitated with a paddle, pulled it out, took the clamps off, and took the casting with the egg carrier on it and put it up in front of an electric fan and dried it." (2031).

With respect to the holes in the cover, Farnham replied that they were blanked off in ⅜th inch squares. In response to a question by the Court, Farnham testified that the blanks satisfactorily made the holes and that it was not necessary to do anything in the way of blowing or wiping, or anything else to perfect the holes. (2062).

Farnham's testimony was unclear as to the length of time over which these cartons were manufactured, on occasion indicating that it was during the years 1937–8–9–40 for periods of not less than three months at a time; for three years; they ran "a small number of them" (2059); he could not say even approximately how many three month periods were run (2024), but production was in the millions (2058).[18] He knew they were "going out" because customers could not get enough printing on them. (2043).

The only use testified to by Farnham was for handpacking the eggs from his own chicken farm. They were put into the "flap side of the carton", the flap going up under the cover (2036). He had no knowledge as to whether or not Defendant's Exhibit 94 was ever automatically filled or closed by machinery. (2062).

When demonstrated in court, the top of the egg section of Defendant's Exhibit 94 appeared to be one-half inch below the top of the cover section, so that no locking occurred. Farnham's answer was that "When the eggs are in there, it pushes out, so they lock." [19] Moreover, being made on the dry head, it was too small "for a regular sized egg." (2063).

Plaintiff made a timely motion to strike Farnham's testimony as not the best evidence for failure to produce the "forms" from which the cartons were made. The Court, under the impression that the only change made to the dry head was stretching wire over it,[20] and that with this addition it functioned satisfactorily [21] unfortunately [22] over-

16. Perhaps this should have aroused the Court's suspicion. While Figure 2 purports to be a cross section of Figure 1, Figure 5 is a plan of the embodiment of Figure 4 which in turn is a modification of Figure 1. (Koppelman Patent '280, Col. 2, ls. 11–25).

17. In production, cartons are formed on the "wet" or male head, and transferred to the dry, or female head. The use of the dry head led to wire marks being on the outside of the carton instead of the inside; and to some recalcitrance on the part of Farnham to admit to any possibility of misnomer or mistake.

18. On Farnham's estimated production (2040) a three month production would have been about 9,000,000. Egg carton production is in the billions. Had there been any substan-

tial production of inverted Koppelman cartons, it seems not unlikely that a least *one* would survive.

19. This would mean that if the first row of eggs were to be removed, the carton would not lock. One of the great merits of Reifers '094 is that it will lock if full, empty, or with any number of eggs from one to twelve, in any cell or cells.

20. See Farnham's testimony (2031) quoted above.

21. Tr. 2043–44, 2062.

22. As will be seen, the dry head was destroyed by Farnham within a few days after his testimony.

ruled the motion without conditioning it upon the dry head actually used being produced in court.

Testimony was concluded the day after Farnham testified, and the case was closed, except for the filing of transcripts and briefs, and final argument. About six weeks thereafter, Plaintiff took Farnham's deposition and filed a motion to reopen on the ground of newly discovered evidence. After a hearing, the motion was granted, and Farnham's deposition was filed.[23]

The deposition contained some startling information.

Although the aluminum heads had been difficult to find, and were not his, Farnham melted down the one he allegedly used "shortly after I got back from Baltimore . . ." (Dep. 54, 20)[24] and made plaques from it.

In the course of the deposition, in Farnham's presence, counsel for Plaintiff stated that in an interview before the deposition Farnham had told him that the dry heads "were taken down to Baltimore." (Dep. 41). There was no denial as to the accuracy of counsel's statement. Counsel for Defendant denied that they had ever seen the dry heads.

This opinion has already set forth the exact language of Farnham when asked how he used the dry head. The only modification to which he referred was stretching, annealing, and sewing fine wire over the dry head. (2031). Much more elaborate procedure, with one extremely important addition, was detailed in the deposition. Four metal strips were used to hold the fine wire onto the casting (Dep. 13); two crude wooden

forming tools were used to shape the wire (Dep. 14–17); *the dry head had no flap with buttons on it;* [25] this part was added (Dep. 43) and the ends were carved (Dep. 52).

The head Farnham used "was used before we designed the one with the flap." (Dep. 45).

In contrast to his testimony in court that the holes were satisfactorily made in the cover, and that it was not "necessary to do anything in the way of blowing or wiping, or anything else to perfect the holes" (2062) in his deposition he said "and the square holes, here, we trimmed them with a knife. When the feather edge went in the pulp went underneath those. We trimmed those . . . with a knife when the stock would go underneath the thing a little bit." (Dep. 50).

This Court entertains grave doubts as to the reliability of any of the Farnham testimony, or that the supposed Koppelman carton (Defendant's Exhibit 94) was ever made. The dry head used had regularly been used for a non-lockable carton.

Even if Defendant's Exhibit 94 were ever made, there is no evidence that it was ever made, or used, commercially. Its construction made it unsuitable for automatic loading or closing—indispensable requirements for a satisfactory egg carton. Moreover, even if used, it could serve its purpose of remaining locked until manually opened, only so long as at least the front row was completely filled with eggs.

Koppelman '280 revisited does not incline, much less persuade, the Court to change its conclusion and ruling in *Walterhoefer.*[26]

---

23. Exhibit A to Docket Entry (104).

24. "Dep." refers to Exhibit A to Docket Entry (104).

25. Indispensable, if the carton were to be fastened, automatically.

26. This makes it unnecessary to consider cases cited by Defendant (Main Brief After Trial 53) for the proposition that the burden of proof of abandonment is on Plaintiff. Two of these, Aerovox Corp. v. Polymet Mfg. Co.,

67 F.2d 860, 861 (2 Cir. 1933) and National Biscuit Co. v. Crown Baking Co., 105 F.2d 422, 425 (1 Cir. 1939) hold that once public use is proved, the burden is on the plaintiff to prove that the use was secret or experimental. The third, Electrol, Inc. v. Merrell & Co., 39 F.2d 873, 878 (8 Cir. 1930) held that where there had been "successful operation" for several years, it cannot be held to be an abandoned experiment simply because its operation is not continued indefinitely.

2. Cox Patent 2,517,465 ('465).

Cox Patent '465 for Molded Pulp Carton issued August 1, 1950, on application filed September 20, 1943. It was extensively considered in *Walterhoefer.*[27]

Cox '465 discloses (a) a locking flange 22 hingedly connected to the upper edge of the front wall of the tray section; (b) a locking flange carrying locking tabs 24 adapted lockingly to engage slots or openings 21 from the outside in, the engagement occurring above the top of the tray section; and (c) the location of the tabs when in locking engagement "preferably" being such that the "locking tabs will be partitioned between adjacent eggs", although it is by no means clear that this would be the case in the structures shown in Figures 5 and 7.

Defendant asserts that it would be "an affront to the intelligence" of any person "to think that he would not be smart enough to see that the tongues and apertures were intended and positioned to be interengaged"; and that this could be done with the flange on the outside or on the inside of the cover.[28]

Aside from the structural changes that would be required, and the express teachings of the patent, it would not be satisfactory to try to fasten Cox '465 from the inside out.

(a) Cox, the inventor, realized the impracticality of the carton even making the closure from the outside in. On paper the idea seemed good, but when he saw the actual construction he recognized that "it was completely impossible." He doubted that a machine could be developed to insert the tabs. The tabs when manually inserted tore off; and the front flap would bow outwardly even if the tabs were inserted. In fact, even at the time of invention Cox was so uncertain as to the practicability of the lock that he disclosed alternative means of locking the flap to the front wall by thermoplastic adhesive.

Cox's summation was that "This carton was completely inadequate to meet any of our commercial requirements, and never went into commercial use." [29]

(b) If it were doubtful that automatic closing could be effected where the tabs were inserted from the outside, it would be even, and much, more difficult to devise a machine that could automatically effect a closure when the tabs were to be inserted from the inside out. It is much simpler to bend the tabs inwardly from the outside than to bend them outwardly from the inside. The flap would have to be pushed very far in as the top came over. The flap would have to be built with a reverse curve so that after insertion the tabs would curl back onto the face of the lid; otherwise the tabs would be projecting out, and would be torn off in ordinary use.[30]

Cox '465 does not make Reifers '094 obvious. It emphasizes the merit of the simple, but completely effective, Reifers carton.

3. Pollard, et al.[31]

Defendant cites six patents and one article in support of the contention that the button and hole lock was old—but none dealt with an article at all resembling, or comparable to, an egg carton,

27. There, as here, on two grounds: (a) obviousness of Reifers '094; and (b) fraud on the Patent Office.

28. Defendant's Main Brief After Trial, p. 60.

29. 289 F.Supp. at 567.

30. Court's comments, Tr. 2286–90; 2298.
The opinion of the Court has not changed from that expressed in Walterhoefer, 289 F. Supp. 562, fn. 29.
"Of course, anything can be done; but what you would have to do is make an arc out of

this fastening piece on the tray and then relax it and push it in at the same time and then straighten it out and I suppose that could be done by machinery, but it is in no way comparable to simply pushing in and closing the lid."
To which might be added the question—if the carton were opened by a customer, how would she (or he) be able to relock it?

31. The question of whether or not Reifers '094 covers plastic egg cartons is treated later.

whether of molded pulp or plastic. They are:

(a) Pollard, 320,814 issued June 23, 1885, on application filed March 27, 1885, for "Car Ticket or Stamp Box."

The article was to be "stamped out or otherwise made at slight cost." (Col. 2, ls. 43–44).

A stud on an outward tensioned section, when the lid is closed, enters "a recess or opening . . . formed into or through the cover . . ." (Col. 2, ls. 43–44).

No compartments or tying partitions are shown.

(b) Hooper, Br. 406,159 issued February 22, 1934, on application filed May 11, 1933, for "Improvements in Boxes or Cases for Jewellry or Other Light Articles."

The box is of molded synthetic resin. The bottom has a relatively thin tongue "in which is fixed a pin having a projective head . . ." (Col. 2, ls. 78–79) which on closing enters a recess in the top.

(c) Vogel 2,483,304 issued September 27, 1949, on application filed December 11, 1945, for "Container" for "a cigarette package or the like" (Col. 1, l. 2) to be made of plastic or other suitable material. A nub or projection in the base engaged a small dimple or recess in the forward wall of the cover part (Col. 4, ls. 73–75). This can be reversed, putting the projection on the cover, and the recess in the flange. (Col. 5, ls. 2–3).

(d) Vogel 2,509,462 issued May 30, 1950, on application filed August 15, 1946, for "Spring Hinge".

". . . a retaining projection 27 formed on the forward wall of flange 20 . . ." engages "within a retaining recess 28 in the forward wall of the cover part . . ." (Col. 3, ls. 72–75).

The claims do not refer to the locking device.

(e) DeWitt 2,215,856 issued August 2, 1938, on application filed June 27, 1936, for "Box".

Although not limited thereto, the patent was at least primarily directed to a tackle box of transparent or translucent material (Col. 1, l. 15) such as celluloid (Col. 1, l. 39).

The specification is far from clear as to the closing mechanisms. While it appears that 13 represents recesses in the cover and projections in the tray, Col. 1, lines 53–55 refer to 13 as "*Knobs* in the front wall of the base and cover." (Emphasis supplied).

While compartments are shown, there is no hinged top.

(f) Hunziker 1,354,042 issued September 28, 1920, on application filed March 8, 1920, for "Cigarette Case".

Hunziker is fully described and analyzed in *Walterhoefer*, 289 F.Supp. at 558. While the Court pointed out on page 559 of 289 F.Supp. the improbability that Hunziker would be discovered (or chargeable to) one in the molded pulp egg carton field, its conclusion was then even if Hunziker '042 had been found, it would not be pertinent. The Court is of the opinion that the same reasoning applies to polystyrene egg cartons, and that the following language (289 F.Supp. at 559) is sound today, with respect to egg cartons, whether of molded pulp or polystyrene:

". . . Hunziker had no flap, or hinged flange, on the 'tray' portion, a feature indispensable in Cox '233 and Reifers '094 for purposes of automated loading and closing; and for safety loading. Opening in Hunziker was accomplished by pushing in the entire bottom or tray section—not pushing in the lug or a flange; and loading was to be from the side, not from above. The Hunziker locking system would be completely (commercially) impracticable in a molded pulp egg carton without serious modifications—e. g., a hinged flange on the 'tray' section, which would not only not be suggested by Hunziker, but which would make Hunziker unworkable.

"The court has been referred to no authority for the proposition that, and

has a presently insuperable difficulty in understanding how, a device which requires a modification making it unworkable suggests such a modification in any field, let alone an unrelated one."

(g) Modern Plastics, April 1946, page 177.

"Latching Methods

"Whenever a hinge without a spring is used, some method must be devised for keeping the cover in a closed position. Figures 11 and 12 show two methods of accomplishing this. In Fig. 11, an undercut bump is molded on the inside of the cover and a corresponding slot is either molded or ground on the outside of the bottom. When rigid materials are used, assembly must be accomplished with great accuracy.

"Another method, shown in Fig. 12, allows for greater variation in the closed location of the top and bottom. In this case, a clip of flexible spring brass is stamped out so that the upper portion has a rounded undercut and the body has a sharp protrusion. A vertical slot is molded in the bottom of the box. The spring clip is then assembled in this slot, and held rigidly in position by the sharp protrusion. An undercut bump is molded in the proper location in the cover so that it will engage with the spring clip. Slight variations in the relative locations of the top and bottom of the box can be compensated for by bending the spring clip either forward or backward."

Note that in both instances the insertion is from the outside in, just as in the pre-Reifers '094 art. Also, in the Fig. 12 illustration, a "clip of flexible spring brass" is used.

If, as Defendant urges, the button and hole lock was so obvious and well-known, the Examiners in the Patent Office should not have allowed any patent based on this lock to issue after Pollard. It is clear that the button and hole lock has many possible applications. Those above cited do not suggest its acceptable application to egg cartons, whether of molded pulp or polystyrene. In none of the instances was the article suitable for an egg carton. In many, there were no compartments or tying partitions. None was intended for automatable filling, or for nesting—both indispensable for a commercially acceptable egg carton.

None of these singly, in combination, or together did what Reifers '094 did— provide an integrally connected egg carton, fully capable of automatable filling; manual opening and reclosing; and effective with or without contents; and nestable.

The "state of the art" at the time of the Reifers '094 invention was considered in *Walterhoefer*, 289 F.Supp. 563–568. This Court concluded then that Reifers '094 was a valid patent for a molded pulp egg carton. A review of Cuno Engineering Corporation v. Automatic Devices Corporation, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58 (1941); Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Graham v. John Deere Co., 383 U.S. 1, 68 S.Ct. 684, 15 L.Ed.2d 545 (1966); Anderson's Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); and National Steel Corporation v. Baltimore & Ohio Railroad, 313 F.Supp. 934 (D.Md. 1970) does not lead to any other or different conclusion today.

Three additional facts support the conclusion of validity.

(1) Commercial success is admitted.

"Unquestionably, the Diamond carton that evolved was a commercial success. Diamond profited handsomely—it sold billions of cartons." [32]

The limited, but sometimes important, effect of commercial success was con-

---

32. Defendant's Reply Brief re Validity, 43.

sidered in *Walterhoefer,* with the standard citations (289 F.Supp. 569–570).

(2) Dolco's advertising contained pictorial representations of an egg carton, emphasizing a lock either identical with, or similar to the appearance of, the Reifers button lock. In the lower left-hand corner of the fourth page of Dolco's twelve page brochure (Plaintiff's Exhibit 45) entitled "How to order your own Kool-Pak Cushion Foam Egg Cartons" the following caption appears under a picture showing a button of the Dolco carton protruding through the opening formed in the front wall of the cover:

> "Revolutionary Easy Lock works perfectly on existing closure equipment to fasten lids firmly in place."

In Dolco's advertisements (Plaintiff's Exhibit 46, Plaintiff's Exhibit 47) the claim is made for the lock that:

> "*Patented* 'Easy Lock' proven fool proof, works perfectly on existing equipment." (Emphasis added).

Continental Packaging Corporation on November 18, 1968, wrote[33] to Dolco (Plaintiff's Exhibit 59A), referring to Dolco's "Patented Easy Lock" feature and inquired as to whether or not Dolco was referring to its own patent; to a license under Reifers '094; or to a "patent applied for" status. On December 27, 1968, Defendant's counsel replied, quite evasively, (Plaintiff's Exhibit 59D):

> "Upon inquiry, I find that the word 'Patented' appeared without intention of threat or warning to the trade but only with intention to illustrate various attributes of the Dolco cartons. To avoid possibilities of confusion or misunderstanding of intent, the working which prompted your inquiry is no longer being used in Dolco advertising."

This Court and this Circuit have frequently recognized the significance of the flattery of imitation.

In Otto v. Koppers Co., Inc., 246 F.2d 789, 800 (4 Cir. 1957), Judge Haynsworth stated:

> ". . . The oft quoted statement of Judge Hough in Kurtz v. Belle Hat Lining Co., 2 Cir., 280 F. 277, 281 is appropriate here:
>
> 'The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent and persuasive of what the rest of the world ought to think,'
>
> a principle well recognized in this Circuit. Ackermans v. General Motors Corp., 4 Cir., 202 F.2d 642; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910."

*See also* McKee et al. v. Graton & Knight Co., 87 F.2d 262 (4 Cir. 1937); Rohm & Haas Co. v. Roberts Chemicals, Inc., 245 F.2d 693 (4 Cir. 1957).

As this Court stated in O. M. I. Corporation of America et al. v. Kelsh Instrument Company, Inc., 173 F.Supp. 445, 457, D.C.Md.; 279 F.2d 579 (4 Cir. 1960):

> ". . . This Circuit has often emphasized the great weight, on the question of validity, that should be accorded the flattery of imitation; that the presumption of validity is further buttressed when the one atacking validity 'gives the tribute of its praise to the prior art' but gives to the patent 'the tribute of its imitation.'"

*See also* Mobil Oil Corporation v. W. R. Grace & Co., 367 F.Supp. 207 (D.Conn. 1973):

> ". . . The fact that the defendant copied the inventions of the patents in suit rather than the prior art is further evidence of invention."

(3) Plaintiff has licensed the manufacture, use and sale of egg cartons under the Reifers '094 patent to the fol-

33. Defendant asserts that the letter was "put up" by the Plaintiff. Plaintiff denies this. No evidence was offered by either side on this point; which the Court in any event considers to be immaterial.

lowing substantial manufacturers of egg cartons:

Molded Container Corporation, February 27, 1964, Plaintiff's Exhibit 161;

Keyes Film Company, January 1, 1966, Plaintiff's Exhibit 166;

Packaging Corporation of America, January 1, 1969, Plaintiff's Exhibit 167; and

Container Corporation of America, April 1, 1969, Plaintiff's Exhibit 168.

As will be further mentioned, the Packaging Corporation of America license covers "molded egg cartons" and "the substitution of materials such as molded plastic, including but not limited to molded foam plastic, for molded pulp . . ." (Paragraph 1(a)).

The Container Corporation of America license provides that "Egg cartons licensed hereunder shall include those made of molded foam plastic and molded pulp." (Paragraph 1(a)).

Container Corporation of America is actually engaged in the manufacture of molded foam plastic egg cartons under its license agreement.

■ The acceptance by the trade of licenses in this volume "is not without significance." American Precast Corp. v. Maurice Concrete Products Co., 360 F.Supp. 859, 863 (D.Mass.1973); Columbia Broadcasting System v. Sylvania Electric Products Co., 415 F.2d 719, 728, (1 Cir. 1969), cert. den. 396 U.S. 1061, 90 S.Ct. 755, 24 L.Ed.2d 755 (1970).

Having determined that *Walterhoefer* was correctly decided and that Reifers '094 was and is a valid patent for a novel molded pulp egg carton, nestable, capable of fully automatable filling and closing, and of manual opening and reclosing, whether full, partially filled, or empty, there still remain the questions as to whether or not (1) Reifers '094 is broad enough to cover polystyrene egg cartons; if so (2) is the accused carton an infringement; and if so (3) is plaintiff for any reason barred from recovering for such infringement?

1. *Is Claim 1 Of Reifers '094 Broad Enough To Cover The Accused Device?*

■ It is importantly to be noted that the real question is not whether polystyrene is the equivalent of molded pulp, but whether Claim 1 of Reifers '094 is broad enough to cover the accused device —a polystyrene thermoformed egg carton. Plaintiff does not contend that all thermoformed polystyrene egg cartons infringe (see, for example, the Haveg carton, Plaintiff's Reply Brief on Infringement, p. 31; Plaintiff's Exhibit 150).

Defendant claims that '094 does not cover the accused device on such a number of grounds that it is somewhat difficult not summarily to say "methinks thou dost protest too much." These include (a) File Wrapper Estoppel; (b) Preamble limitation; (c) Dedication; (d) Failure to Apply for Reissue; (e) Statement of Reifers' Attorney in prosecution.

(a) File Wrapper Estoppel.

■ Defendant vigorously, and repeatedly, argues that file wrapper estoppel applies to any attempt to assert that the claims of '094 cover polystyrene egg cartons. However, a review of the file wrappers shows that this is not one of the classic cases in which an application is amended and narrowed to get the Examiner's approval, and then after the issuance of the patent, it is sought to apply the broader, but withdrawn, scope. First, the Examiner never did accept the claim (Claim 1) in suit. Secondly, the Board of Appeals did not allow the claim because of, or based upon, any narrowing of the claim by amendment. Third, polystyrene is no where mentioned in the entire file.

Since Defendant relies, although without justification, upon file wrapper estoppel, an unusually detailed review of the file history is justified, if not required.

(1) The original application included fourteen claims directed to a molded pulp carton, and four claims directed to a lock construction per se. All were rejected as unpatentable over Koppelman 2,093,280. Minor amendments were filed

to the pending claims, and four new claims were added, directed to a "one-piece molded pulp carton." Manufacturing advantages were claimed, and it was stated:

". . . To provide an improved carton construction which will lock itself closed is but a slight contribution to the art, indeed, if that carton cannot be successfully made on any existing type of pulp molding equipment." [34]

A supplemental amendment was filed, cancelling all claims then on file, adding six new claims, all directed to a molded pulp carton; and additions were made to the specification. Before any office action was taken, a second application was filed and the first application was abandoned. This second application included a specification different from the original one, and twelve claims directed to a "molded pulp egg carton." All claims were rejected on Cox 2,529,140, Koppelman 2,093,280, and Bergstein 2,-474,391. An amendment was filed, cancelling ten of the original twelve claims, and added five new ones. Two of these were directed to a "molded pulp carton" but three had no limitation [35] as to material. All claims were rejected on Koppelman and Cox. The Examiner did indicate, however, that Claim 17, one of the claims with no limitation as to material, would probably be allowable if it were amended to specify certain details as to frustro-conical surfaces of certain flanges. An amendment (Claim 18) was filed, but the suggestion of the Examiner was not specifically adopted.

(2) By amendment, one of the non-molded pulp claims was cancelled, and three new claims were filed not limited to molded pulp.

All claims were rejected as unpatentable over Koppelman in view of Cox.[36] The second application was abandoned in favor of a third. Its specification was substantially similar to that of the second. It contained eleven claims, of which the first six were not limited to molded pulp.

All claims were rejected on Shellman Australian Patent No. 164,896 and Koppelman 2,093,280 in view of Schilling 2,600,130. Various amendments were made, in the course of which Plaintiff sought to distinguish Koppelman on the ground that it required subsequent cutting or punching. On further rejection of all claims they were cancelled in favor of four new ones. These again were rejected on Koppelman, Cox and Schilling; and two new ones were filed, claiming "a nestable molded pulp egg carton made of relatively flexible molded pulp." These were disallowed, and an appeal was taken. In its appeal brief, Plaintiff stated that the "invention relates to molded pulp egg cartons capable of being mass produced by the suction pulp molding process." It was agreed that Koppelman and Schilling could not be molded. The Board of Appeals referred to the claimed subject matter as relating "to a molded pulp egg carton."

(3) This is not a case in which, in order to get a claim allowed, an applicant amends his claim to meet the Examiner's objection, after which the claim is allowed. Hence cases such as Exhibit Supply Co. v. Ace Corp., 315 U.S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736 (1942); I. T. S. Co. v. Essex Co., 272 U.S. 429, 443, 47 S.Ct. 136, 71 L.Ed. 335; Baker-Cammock Hosiery Mills v. Davis Co., 181 F.2d 550, 563 (4 Cir. 1950); Carter Products, Inc.

---

34. Reference will again be made to the quoted language.

35. "Limitation" is not used as a term of art, but here, and in the balance of the history of the prosecution in the Patent Office, means only that there was no direct reference to any particular material.

36. Defendant says (Main Brief After Trial, p. 103) that:

"*The Examiner thus refused to allow any claim that did not contain a limitation to 'molded pulp'.*" (Emphasis in original).

This is true, but at the best is quite disingenuous. The Examiner did refuse to allow any claim that did not contain the words "molded pulp". But he also refused to allow any claims that *did* contain the words "molded pulp". He refused to allow *any* claims.

v. Colgate & Palmolive Company, 164 F.Supp. 503, 520 (D.Md.1958), aff'd. 269 F.2d 299 (4 Cir. 1959) ; Doughnut Mach. Corporation v. Joe-Lowe Corporation, 67 F.2d 135 (4 Cir. 1933) ; International Latex Corp. v. Warner Bros. Co., 276 F.2d 557 (2 Cir. 1960) ; Dow Corning Corporation v. Chertkof, 243 F.Supp. 947 (D.Md.1965) ; Long Manufacturing Co. v. Holliday, 246 F.2d 95 (4 Cir. 1957) ; and Parke, Davis & Co. v. American Cyanimid Co., 207 F.2d 571 (6 Cir. 1953), are not in point.

In the instant case the Examiner consistently refused to allow any claim, whether or not incorporating the words "molded pulp" on the ground of lack of invention over the prior art, all of which involved molded pulp; and in only one instance (where no specification of material appeared) did he indicate how his objection could probably be met by amendment.

The prosecution of the patent does not involve this usual aspect of file wrapper estoppel.

(b) Preamble Limitation.

■ Defendant contends that the first twelve (really thirteen) words of Claim 1 :

"In an integral and nestable egg carton made of relatively flexible molded pulp"

and the language, appearing at about the middle of Claim 1 "said molded pulp carton being integrally formed", constitute a "preamble limitation", precluding polystyrene being covered by Claim 1. In part this would appear to be another facet of file wrapper estoppel. It is primarily discussed by Defendant, however, in connection with infringement.

Although all cases cited by Defendant and Plaintiff will be mentioned, probably the most thorough discussion of the principles involved is found in Kropa v. Robie, 187 F.2d 150, 38 CCPA 858 (1951) when the Court stated:

"Is the phrase 'An abrasive article' a limitation upon what follows in the counts in issue ? This court has often had before it the Jepson problem (243 O.G. 525—1917)—whether the preamble to claims in ex parte cases or to the counts in interference cases should be considered as limitations in the claims or counts. Of the thirty-seven cases [37] of this court we have reviewed with respect to this problem it appears that *the preamble has been denied the effect of a limitation where the claim or count was drawn to a structure and the portion of the claim following the preamble was a self-contained description of the structure not depending for completeness upon the introductory clause;* or where the claim or count was drawn to a *product* and the introductory clause merely recited a property inherent in the old composition defined by the *remaining part* of the claim. In those cases, the claim or count apart from the introductory clause completely defined the subject matter, and the preamble merely stated a purpose or intended use of that subject matter."

\* \* \* \* \* \*

". . . On the other hand, in those ex parte and interference cases where the preamble to the claim or count was expressly or by necessary implication given the effect of à limitation, the introductory phrase was deemed essential to point out the invention defined by the claim or count. In the latter class of cases, *the preamble was considered necessary to give life, meaning, and vitality to the claims or counts.*" (Emphasis supplied).

Even more succinctly, the Fourth Circuit stated in Marston v. J. C. Penney Co., 353 F.2d 976, 986 (4 Cir. 1965) :

"If the preamble merely states a purpose or intended use and the remainder of the claim completely defines the invention independent of the preamble,

**37.** The score card would show that in twenty-three ex parte cases and four interference cases the Preamble was held not to express a limita-tion, while in six ex parte cases and four interference cases Preamble language was held to be a limitation.

it is not a limitation on the claims. On the other hand, if the claim cannot be read independently of the preamble and the preamble must be read to give meaning to the claim or is essential to point out the invention, it constitutes a limitation upon the claim."

The general rule, and its exception, were recognized in Stradar v. Watson, 100 U.S.App.D.C. 289, 244 F.2d 737, 741 (1957), where each claim contained not only the same preamble, but the same concluding limiting language.

In Deutsch et al. v. Ball, 77 F.2d 930 (CCPA 1925) the court held that in interference proceedings the senior party was entitled to prevail over the junior party, whose claim was identical with that of the senior party except for the insertion in the claim of the use to which the junior party sought to apply his invention.

On the other hand, the court in Application of DeNapoli, 302 F.2d 768, 49 CCPA 1056 (1962) held that the limitation in the preamble by the words "In a phonographic transcribing machine" cooperated with the rest of the structure in such a way as to avoid the prior art which corresponded to all of the structure, except for the preamble, but in a different environment.

It might be noted that neither Reifers' Data of Invention (Plaintiff's Exhibit 132) nor his more detailed write-up of his invention (Defendant's Exhibit 61) makes any reference to the material from which the patented article was to be made. On cross-examination Reifers testified that he was not told to make his carton of molded wood pulp; that the material was not discussed.[38]

This Court believes its summary[39] to be an adequate and accurate summary of Reifers' attitude with respect to material:

"Whether he [Reifers] should have foreseen what was going to happen or whether he shouldn't, is something that is going to be argued and I am going to have to try to determine it significance wise. He has made a very forceful approach to 'I wasn't concerned about material. I was concerned about a concept of a lock on an egg carton . . .'—'It seemed to me that it didn't make any particular difference what the material was. I was working, everybody was working with either chipboards or molded fiber at that time and that, therefore, it seemed to me to say how it should be done on egg cartons of this kind, was all I had to do."

The Court finds no basis for the exclusion of polystyrene from the scope of Claim 1 on the ground of Preamble Limitation.

(c) Dedication.

Defendant's argument here overlaps the defense of file wrapper estoppel. In addition, Defendant argues that there was dedication, evidenced by:

(i) Claim 1, for a carton made of relatively flexible molded pulp. The file history has been adequately reviewed herein.

(ii) A letter (Defendant's Exhibit 52) of May 17, 1951, from Carl Flocks, then and now patent counsel, that:

"What will become the Reifers patent claim 1 has the following mandatory features:

"(a) A molded pulp carton having an integral cellular tray . . ."

Plaintiff adequately replies that this communication was directed to the applicability of forthcoming Claim 1 to a molded pulp egg carton made according to Lambert Patent No. 2,978,162 which had issued shortly before. Since the carton in fact constructed under what became Reifers '094 was also a molded pulp egg carton, it would have been irrelevant to go beyond the similar features of the two cartons.[40]

---

38. Transcript 1265.

39. Transcript 1640.

40. Even if the quotation were an accurate appraisal of Mr. Flocks' then thoughts of the scope of Reifers '094, which it is not, it would

**1238**

(iii) The statement by Plaintiff's counsel on November 16, 1958, in General Packaging Corporation (The Diamond Match Company, assignee) v. Atlas Tack Corp., In the United States District Court for the Northern District of New York, Civil Action No. 5126, that

"The words 'molded carton' refer to a carton molded from a slurry of paper pulp."

This was in response to a demand for a "bill of particulars" as to why the accused carton was claimed to infringe the Sherman Tab-Lock Patent No. 2,587,909 (Plaintiff's Exhibit 71), in which the various clauses of Claim 1 of Sherman were related to the accused carton. That carton was also molded from a slurry of paper pulp. That the response was intended only to show that identical elements were found in both articles, is clear by the second sentence:

"The words 'a molded carton' refer to a carton molded from a slurry of paper pulp. Defendant's cartons, Interrogatory Exhibits A and B, are such molded cartons . . ."

This response related to a patent other than Reifers '094; but both the Sherman and the accused devices were molded pulp. It was therefore necessary, on the infringement issues, to point out only the exact reading of Sherman on the accused device. It was not necessary to rely upon the doctrine of equivalents, and the failure to do so would not have been, even as to Reifers, a waiver or an estoppel.

(d) Failure To Apply For Reissue.

■ Defendant strenuously contends that the failure of Plaintiff to apply for reissue, apparently to claim for polystyrene cartons, is an abandonment of the right now to assert that Claim 1 of '094 covers (any) polystyrene egg carton.

Section 251 of United States Code Title 35, reads in pertinent part:

"Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue."

\* \* \* \* \* \*

"No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent."

Defendant contends [41] that:

". . . The evidence in this case clearly established that prior to the expiration of the time within which Reifers could have applied for reissue in June 1963, there were so many indications that plastic cartons were on the horizon that it is impossible to believe that Reifers and the Plaintiff didn't know of them."

Although efforts toward the development of polystyrene that might, among other things, be useful for the manufacture of egg cartons had been carried on before 1963, the evidence would seem to establish that while some effort toward commercial production occurred in 1965,[42] the first real commercial production of egg cartons from Dow polystyrene foam was in 1968.[43]

not be binding on this Court any more than is Mr. Flocks' oft-repeated opinion that the accused structure is covered by, and an infringement of, Reifers '094.

41. Defendant's Main Brief After Trial.

42. Snow, Defendant's witness and inventor in Snow Patents No. 3,398,875 and No. 3,603,499; and Transcript p. 1918.

43. Dow's Memorandum in support of Motion to Dismiss as to it the Complaint herein, filed October 29, 1969:
". . . In fact, although the material [Dow's polystyrene foam] has been on the market since as early as 1964, it was only in 1968 that anyone succeeded commercially in manufacturing egg cartons out of it."
[Bracketed matter inserted].

Five years, or even two years, would seem to a rather far horizon to require Reifers to see and appreciate.

Moreover, if Defendant should prove that in 1963 plastic was known as the equivalent of molded pulp, it would be covered by Claim 1 without amendment.

". . . Mere formal alterations in a combination in letters patent, however, are no defense to the charge of infringement, and the withdrawal of one ingredient from the same and the substitution of another which was well known at the date of the patent as a proper substitute for the one withdrawn, is a mere formal alteration of the combination if the ingredient substituted performs substantially the same function as the one withdrawn."

Seymour v. Osborne, 78 U.S. (11 Wall) 516, 555–556, 20 L.Ed. 33 (1871); Laser Alignment, Inc. v. Woodruff & Sons, Inc., 491 F.2d 866 (7 Cir. 1974).

If polystyrene in 1963 was well known as the equivalent of molded pulp, there was no need to claim it. If it was not, then it could not properly be claimed by reissue, but would require a separate application and a different patent.

As the Court, perhaps somewhat inelegantly, stated in the course of the trial, you do not negative something that is going to happen in the future, or put in the patent that you claim "anything else the Lord may give us the insight to develop which can be used." [44]

This case was filed May 26, 1969. Defendant certainly knew that an important question would be the availability of polystyrene for egg cartons in the period 1952–1963, and whether during that period any egg cartons, with or without the Reifers lock, had been made. The Plaintiff knew this also, and directed Interrogatory 93 to Defendant, as follows:

"93. Was foam polystyrene sheeting, suitable for the forming of ther-

moformed egg cartons, commercially available in 1961?"

The original answer, filed about January 5, 1971, reads as follows:

"The quality of foam polystyrene sheeting, its availability, or its suitability for the forming of thermoformed egg cartons as of February 1952 or 1961 is unknown to the Defendant. *Defendant believes* that foam polystyrene sheeting was *unknown* as of February 1952, *or, if known, was no more than a laboratory curiosity.* The same answer applies to 1961." (Emphasis added).

The trial began on March 1, 1971, and after hearing opening statements the Court and parties visited Palmer (Plaintiff's plant) and Lawrenceville (Dolco's plant). Upon return and before the taking of any testimony the Court indicated [45] the probable significance of the availability of foam polystyrene, and particularly if "practical cartons were being made at that time."

So alerted and alarmed, Defendant filed an amended answer on January 27, 1971, stating:

"To avoid any possibility that Plaintiff may be misled by Defendant's previously filed response to Plaintiff's interrogatory No. 93, Defendant hereby informs, and notifies Plaintiff of facts which have come to the attention of Defendant's counsel subsequent to the time Defendant's original answer to interrogatory No. 93 was filed and upon which Defendant will rely at trial."

The amended answer lists some thirty-five publications or patents and two court decisions. Defendant contends that these describe usage of foam polystyrene sheet materials produced by the extrusion process in the manufacture of various types of products including containers "similar to egg cartons, but not specifically including egg cartons."[46]

44. Transcript 224.

45. Transcript 223, 224, 227.

46. Pretrial Order, par. 49.

Defendant refers to abortive efforts by Mead Corporation beginning in 1961 to make egg cartons from flexible styrene foam; and the work of Container Corporation of America on foam sheet material from 1962, and production for sale in 1965. However, as previously noted, on April 1, 1969, after the Walter-hoefer decision, Container Corporation of America took a license for egg cartons "made of molded foam plastic and molded pulp" (Plaintiff's Exhibit 168); and is actually manufacturing molded foam plastic egg cartons under that license.

■ From the foregoing, the Court holds that Plaintiff is not barred by its failure to apply for a reissue patent, from claiming that Claim 1 of Reifers '094 reads on the accused carton.[47]

(e) Statement of Reifers' Attorney In Prosecution.

In the course of the prosecution of the Reifers patent, his attorney said, in part:[48]

". . . To provide an improved carton construction which will lock itself closed is but a slight contribution to the art, indeed, if that carton cannot be made on any existing type of pulp molding equipment."

First, this argument was made in relation to Claim 2 of Reifers '094, relating to locating the locking lugs on the top margin of the flap and the locking apertures at the junction of the top cover panel with the cover front wall. That claim is not involved in this litigation.

Secondly, paperboard and molded pulp were the egg cartons then in use. Reifers was working with pulp molding equipment, and if the patented carton could not be molded, but only, say, made by hand, it would be commercially valueless.

Thirdly, in any type of molding equipment whether for wood pulp or foam polystyrene, the article to be molded must have such configuration that it may be removed from the mold without undue effort or destruction.

None of the foregoing singly, or in totality, is or are enough to exclude polystyrene from the coverage of Claim 1 of Reifers '094. As pointed out under the next topic, Infringement, polystyrene performs the same function as molded pulp, in the same way, to produce the same results—in other words, is an equivalent. Anticipatorily, however, the following factors should be considered:

1. As pointed out above, the trade considers that Reifers '094 covers polystyrene (when of similar configuration) by accepting licenses under Reifers '094 for molded pulp and polystyrene:

Packaging Corporation of America, January 1, 1969, Plaintiff's Exhibit 167; and

Container Corporation of America, April 1, 1969, Plaintiff's Exhibit 168.

Secondly, the interchangeability of molded pulp and polystyrene is recognized in the very patent under which Dolco manufactures the accused cartons—Snow 3,398,875. The Abstract of the Disclosure refers to egg cartons generally, without reference to material. The patent itself states:

"Egg cartons are made to nest and have their bottoms and tops of approximately the same depth. When

---

47. Defendant contends that Plaintiff was afraid to apply for a reissue patent because ". . . he was afraid that if he advanced a new claim broad enough to cover foamed polystyrene the Patent Office would turn him down as it had done some four times previously . . . [H]e would have been *conclusively* prevented from contending that it was broad enough to cover foamed polystyrene."

(a) The Patent Office Examiner never rejected a claim specifying polystyrene. He did reject claims broader than molded pulp, but he also rejected claims containing those words; he rejected all claims.

(b) Rejection is an application for reissue and abandonment of appeal do not give rise to "file wrapper estoppel, collateral estoppel or *res judicata*, so as o preclude a plaintiff _ _ _ from asserting the doctrine of equivalents." 4 Deller's Walker on Patents, Sec. 308; M.O.S. Corp. v. John I. Haas Co., 332 F.2d 910, 915 (9 Cir. 1964).

48. File Wrapper No. 1, p. 38.

*molded foam pulp or a plastic of about the same stiffness as pulp . . ."* [49]

The specifications contain no reference to material. The claims each refer to a "molded carton" without further description of its material.

Thirdly, in Snow Patent No. 3,603,-499, issued September 7, 1971, Snow states (Col. 1, ls. 64–66):

> "The egg carton shown in the drawing is molded from foam pulp or a suitable plastic, polystyrene foam being a preferred example . . ."

Fourthly, the Patent Office classifies Snow 3,398,875, Snow 3,603,499, Reifers '094, and the Commisso (Mobil) Patent No. 3,337,110 [50] for a carton from paper pulp or foam plastic in Class 229 (Paper Recepticles) subclass 2.5 (Pressed).

Again, pulp is the preferred material, with polystyrene as a substitute equivalent.

### 2. *Infringement—Equivalance—Law.*

Plaintiff does not contend that Reifers '094 covers *every* plastic egg carton. It does contend that the accused carton, although made of foamed polystyrene is the equivalent of the carton covered by Claim 1 of Reifers '094. With this the Court agrees, on the basis of the grounds hereinafter considered. These grounds include the similarity if not identity of the configurations (geometry); the fact that the accused carton was designed with knowledge of Reifers '094; that Dolco never did consider making a carton with a lock different from Reifers'; Dolco's advertising of the Reifers lock as revolutionary and foolproof; the interchangeability of the cartons; their similarity of action when loaded with eggs; and the absence of any significant difference between the two.

(a) Similarity Of Configuration (geometry).

A visual examination of the Reifers carton and the accused carton will show their striking physical and functional similarity, and particularly the similarity of the cover with the female receptacles and holes, and the flap on the tray, with the male members or lugs or buttons, the locking being from the inside out. Further comparison would seem to be unnecessary in view of Defendant's concession:

> "Purely for the purposes of argument it may be conceded that the contours and dimensions (persistently referred to by plaintiff as the 'geometry' of the carton) and the respective modes of operation of the two cartons are quite similar. But even if they were absolutely identical, this fact would not provide an excuse for the application of the doctrine of equivalents . . ." [51]

For this contention Defendant relies upon International Latex Corp. v. Warner Bros. Co., 276 F.2d 557 (2 Cir. 1960); Parke, Davis & Co. v. American Cyanamid Co., 207 F.2d 571 (6 Cir. 1953); and Slayter & Co. v. Stebbins-Anderson Co., 117 F.2d 848 (4 Cir. 1941). None of these supports Defendant's position.

In *International Latex,* plaintiff's patent was for a latex girdle "the external surfaces . . . being smooth and the inside surfaces thereof being of a slightly roughened matted character." This language was the result of an arduous experience in the Patent Office, and was expressly required to overcome cited prior art. The court held that this was not infringed by a latex girdle in which flocking had been inserted, instead of roughening the latex itself.

In *Parke, Davis,* plaintiff sued defendant for alleged infringement of its patent for an antianemia vitamin product. The claims called for an acid "derived by autolysis of mammalian liver tissue . . ." In its application plaintiff had endeavored to obtain claims not limited to this specific derivation, e. g. "obtainable from" or "a constitment of" or "derivable from mammalian liver tissue." The Patent Office required the use of

---

49. Plaintiff's Exhibit 30; Col. 1, ls. 50–53. Note that molded pulp is first mentioned, with plastic as a second choice, or equivalent.

50. Plaintiff's Exhibit 56.

51. Defendant's Reply to Plaintiff's Main Brief After Trial, 16.

"derived". Plaintiff yielded, and the claims so amended were allowed.

The court held that under these circumstances defendant's product which was a "chemical compound identical with that described in the patent but . . . is made from different starting materials and by an entirely different process from the product of" plaintiff, and "not derived from mammalian liver tissue nor from any animal product" was not infringing.[52]

In *Slayter & Co.*, the patentee's preferred blown wall insulation was comminuted corncobs and plaster of paris. The court held that although the patent was void for lack of invention, even if valid it would not have been infringed by the substitution of old for new.[53]

(b) The Accused Carton Was Designed With Knowledge of Reifers '094.

That Snow, the patentee in Patent No. 3,398,875 under which the accused carton is licensed to and made by Dolco, was familiar with Reifers '094 before Snow designed his carton is clear from the evidence. (Transcript p. 1982).

"Q. [By Mr. Brinkman] Mr. Snow, I believe in a question asked by the Court, you testified that before the design of your carton was finished, you became familiar with the patents in the egg carton field, is that correct?

"A. [Mr. Snow] Yes, I did.

"Q. [By Mr. Brinkman] I will show you herewith a copy of a patent which is the patent in suit, Reifers patent 2,990,094, Plaintiff's Exhibit 19, and I will ask if this was among the patents that were considered at that time.

"A. [Mr. Snow] Yes, it was."

This makes it difficult to understand how Defendant could seriously argue[54] that Hoeltke v. C. M. Kemp Mfg. Co., 80 F.2d 912 (4 Cir. 1935) is "readily distinguishable, one outstanding difference being that in *Hoeltke* the patented device had been submitted to the defendant and it designed its alleged avoidance with that device before it."

That Dolco recognized the risk involved in manufacturing and selling the accused carton, is seen by the fact that "Dolco was advised, as Portco[55] had been, that its cartons do not infringe the Reifers patent."[56]

(c) Dolco Never Considered Making A Carton With A Lock Different From Reifers' Lock.

Pretrial Order, par. 30:

". . . DOLCO never did consider making an egg carton with a different type lock from the one on the accused carton . . ."

Pretrial Order, par. 4:

"Dolco says that it has 'refused to respect' the patent in suit."

Defendant's Reply to Plaintiff's Main Brief After Trial, p. 21:

"The true facts of the case are that *Dolco never attempted to design an egg carton to avoid the Reifers patent.*"

(Emphasis in original).

(d) Dolco Advertised The Reifers Lock as "Revolutionary" and "Foolproof".

(i) Revolutionary.

In the lower left hand corner on page 4 of the twelve page brochure of Dolco[57] entitled "How To Order Your Own Kool-Pak Cushion—Foam Egg Cartons" appears a picture showing a button of the Dolco carton protruding from the inside out through the round opening in the front cover, and beneath it the caption:

"Revolutionary Easy Lock works perfectly with existing closure equipment to fasten lids firmly in place."

---

52. 207 F.2d at 573.

53. The converse—new for old—is considered later.

54. Defendant's Reply to Plaintiff's Brief After Trial, p. 16.

55. Assignee of Snow Patent No. 3,398,985.

56. Defendant's Reply to Plaintiff's Main Brief After Trial, p. 22.

57. Plaintiff's Exhibit 45.

(ii) Foolproof.

In advertisements Plaintiff's Exhibit 46 and Plaintiff's Exhibit 47 appear sketches of the outside of a two button carton, with arrows pointing out the two button locks, accompanied by the slogan:

"Patented 'Easy Lock' proven fool proof works perfectly on existing equipment."

The importance and value of the locking construction could scarcely be more strongly indicated.

As has heretofore been mentioned, on November 18, 1968, an inquiry [58] was directed to Dolco with respect to the "patent number which covers this 'Easy Lock' feature." The inquiry continued:

"We are, of course, very familiar with Diamond National Corporation's Patent No. 2,990,094 otherwise known as the Reifer's Patent, so if you are operating under license from Diamond National under this particular patent, then, a simple statement to this effect will suffice to answer this inquiry.

"If you are operating under a 'patent applied for' status, then, I believe that your advertising should be corrected to so indicate."

On December 27, 1968, counsel for Dolco (who are trial counsel herein), replied [59] in pertinent part:

"Upon inquiry, I find that the word 'Patented' appeared without intention of threat or warning to the trade but only with the intention to illustrate various attributes of the Dolco carton. To avoid possibilities of confusion or misunderstanding of intent, the wording which prompted your inquiry is no longer being used in the Dolco advertising."

Defendant disingenuously, if not dishonestly, now tries to explain the questioned advertising by saying: [60]

"It is highly significant that Mr. Snow was granted United States Patent No. 3,398,875 (PX 30) for his carton construction. The claims of this patent cover the novel relationship of the flap, cover, buttons and holes of the carton and it is this 'Snow patent under which Dolco is licensed, that was referred to in the Dolco advertisements."

Snow Patent No. 3,398,875 was issued on June 27, 1968, on application filed December 30, 1966. If in fact counsel believed it covered the advertised carton, that would constitute a legitimate "threat or warning to the trade," and there not only would be no reason why "the wording" was "no longer being used in the Dolco advertising", there would be every reason why it should be, but with "Patent Pending" before June 27, 1966, and with the patent number thereafter. If Snow 3,398,875 covered the carton, notice of the patent *should* be given.

A strong argument can be made that the advertisements and counsel's letter of December 27, 1968, were a recognition that the carton with the lauded "revolutionary" and "fool proof" lock was indeed patentable; and patented—but by Reifers, not Snow.

(e) Interchangeability of Accused And Reifers Cartons.

That the Dolco and Reifers cartons are fully interchangeable on packaging machinery, and that this is so in general use, is not disputed.

". . . The design of the [DOLCO] carton was dictated, however, by the fact that it had to operate on existing Page—Detroit [Diamond] machines and had to run interchangeable with other cartons because some users dictated the carton in which their eggs were to be packed (R. p. 1921)." [61]

\* \* \* \* \* . \*

From Dolco brochure: [62]

"Will my equipment handle Kool-Pak cartons?"

---

**58.** Plaintiff's Exhibit 59A.

**59.** Plaintiff's Exhibit 59D.

**60.** Defendant's Reply to Plaintiff's Main Brief After Trial, p. 25.

**61.** Defendant's Reply to Plaintiff's Main Brief After Trial, p. 23. Bracketed material added.

**62.** Plaintiff's Exhibit 45.

"Yes. Kook-Pak cartons run well on all major egg handling equipment, including standard pulp belt line closers and in-line closers. When adjustments are necessary for peak efficiency, our field service engineer will handle the adjustments for you. These adjustments are very minor and allow you to run Kool-Pak cartons interchangeably with pulp side close cartons at top speeds . . ."

\* \* \* \* \* \*

Paragraphs 16 and 17 of the Pretrial Order:

"16. The accused cartons are 'fool proof' and 'work perfectly on existing equipment', which includes DIA-MOND'S closer which automatically closes DIAMOND'S cartons. DOLCO proved to itself that the DOLCO carton is 'fool proof' and 'works perfectly on existing equipment', which includes DIAMOND'S closer. ·

"17. With very minor adjustments on egg handling equipment, including standard pulp belt line closers and in-line closers, the DOLCO Kool-Pak cartons can be run interchangeably with pulp side close cartons including DIAMOND'S molded pulp cartons."

\* \* \* \* \* \*

Paragraph 19 of the Pretrial Order:

"19. There was a time when MFE was using both DIAMOND'S cartons and DOLCO cartons."

\* \* \* \* \* \*

Paragraphs 28 and 29 of the Pretrial Order:

"28. MFE sells the accused cartons to the same customers to which MFE previously sold DIAMOND'S cartons. These customers include Schafer Bros. and farmers and the sales to these customers of the accused cartons are in the same manner as MFE had previously sold DIAMOND cartons. MFE's sales of such cartons without eggs in them are only nominal.

"29. In responding to plaintiff's inquiry [Interrogatory No. 59] as to whether MFE did supply the same customer with eggs packed in some of DIAMOND'S cartons and with eggs packed in some of DOLCO'S cartons, the defendant states:

"Yes. When MFE started using Dolco's cartons it still had on hand a quantity of Diamond's cartons. MFE found a strong preference for Dolco's cartons among its customers. In order to use up its inventory of Diamond's cartons, MFE followed the policy of including one or more Diamond cartons with a shipment of MFE cartons where the customer would tolerate this. MFE cannot from its records determine in detail precise instances in which this was done."

(f) Similarity of Action of Both Cartons On Manual Operations.

As pointed out in *Walterhoefer* (289 F.Supp. at 555, 581, fn. 155) in addition to automatable filling and closing, egg cartons must be susceptible of manual opening, removal of eggs, and closing; and the lock must function satisfactorily no matter how few eggs remain, or their relative relation to each other, and to the front or rear of the carton. That is, the carton must open and relock satisfactorily even if there be no eggs in the front row, or if the front row, or the entire carton, be full. Physical examination, inspection and handling by the Court led to the unqualified opinion that from a functional standpoint the operation and functioning of the two cartons was equivalent.[63]

Just as in *Walterhoefer*,[64] Defendant argues that the accused carton is constructed "so that the eggs resisted inward movement of the flap, making the carton more secure against accidental unlocking"[65] and "The cover was designed to be unlocked by *pulling away from the buttons* rather than by depressing the buttons. (It is appreciated that the Court has indicated that in its view

---

63. Transcript 1458, 1466, 1473, 1469.

64. 289 F.Supp. at 555, 581.

65. Defendant's Reply to Plaintiff's Main Brief After Trial, p. 23.

the carton could still be opened by depressing the buttons. However, this particular mode of opening was accomplished by deforming the buttons and by someone who had spent literally weeks on end studying this type of carton . . .)" [66]

The Court expressed doubt that the eggs did in fact exert any pressure against the locking tab on the tray, and summarized its handling of the accused carton, loaded with eggs, as follows:

"Excuse me. If the thing is important, and apparently it is, I think I have made it abundantly clear, but I will say for the record that I opened the carton in the way in which I opened molded pulp cartons, by pushing in the two knobs and raising the cover, and that I did not intentionally pull the cover forward in so doing, and that my fingers were around the corners so that while I could, of course, pull forward, it was not a grasping with the thumb and fingers, which would be the normal way, I think, of pulling the cover forward; and that I did that twice, and that I had no difficulty in opening the carton in that way, or in reclosing it; and that it appeared satisfactorily locked after each closure."

It is suggested that the Court's conclusions, from observing and handling, were also pragmatically sound.

If the eggs were in fact pushing forward against the front flap, helping to hold it locked:

(i) It is doubtful if the carton could satisfactorily be closed by automation, since it would be necessary delicately to depress the flange, to spring the front side of the cover forwardly and to draw it down below the lugs before releasing it.

(ii) If the front row were empty of eggs, then on Defendant's theory the carton should not lock satisfactorily; but it did.

(iii) A shopper, seeing lugs that invite "Push me in" is going to do just that; and if the eggs prevent depressing the lugs, then the eggs themselves are going to be depressed and probably broken.[67]

(iv) If Defendant's contention were sound, the cover should contain a warning, such as: "Pull, don't push."

Aside from the obvious sensitivity displayed by this effort on the part of Defendant, it is significant that substantially the same argument was made, equally ineffectively, in Walterhoefer with respect to the accused molded pulp egg carton; showing the similarity between (equivalence of) the two accused cartons; one of foamed polystyrene and the other of molded pulp.

In *Walterhoefer* this Court held:[68]

The Reifers patent "is of substantial importance in the field of egg cartons, especially molded pulp egg cartons, constituting 'a valuable contribution to the art' entitling the patent 'to liberal treatment'"; citing Hoeltke v. C. M. Kemp Mfg. Co., 80 F.2d 912, 921 (4 Cir. 1936); Denominational Envelope Company v. Duplex Envelope Co., 80 F.2d 186, 187, 193 (4 Cir. 1935); Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

Even without "liberal treatment", the accused carton, on the facts and under the applicable law, is the equivalent of the Reifers carton, and infringes Claim 1 thereof.

## THE LAW

In Graver v. Linde, supra, the issue was whether or not a patent claim for welding fluxes made predominantly of alkaline earth metal silicates covered welding fluxes made predominantly of manganese silicate, which is not an alkaline earth metal silicate. In holding that it did under the doctrine of equivalents, the court used what is probably the most

---

66. Defendant's Reply to Plaintiff's Main Brief After Trial, p. 24. (Emphasis in original).

67. Walterhoefer, 289 F.Supp. at 555.

68. 289 F.Supp. at 579.

quoted language explanatory to the doctrine.

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

"The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of Winans v. Denmead, 15 How. 330, [56 U.S. 330, 14 L.Ed. 717] it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. 'To temper unsparing logic and prevent an infringer from stealing the benefit of the invention' a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.' Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, [50 S.Ct. 913, 74 L.Ed. 147]. The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.' Machine Co. v. Murphy, 97 U.S. 120, 125, [24 L.Ed. 935] . . .'"

(339 U.S. 607–608, 70 S.Ct. 855, footnote omitted).

The Fourth Circuit had previously expressed similar views in Hoeltke v. C. M. Kemp Mfg. Co., 80 F.2d 912, 921–922 (1935):

"[6] The learned District Judge was of opinion that complainant was not entitled to invoke the doctrine of equivalents and must be confined to the exact device disclosed by his patent. In this we think there was error. Whether complainant's patent be treated as a pioneer or basic patent or not, he unquestionably made a valuable contribution to the art; and it is well settled that in such case his patent is entitled to liberal treatment. As said by Chief Justice Taft in Eibel Process Co. v. Minnesota, etc., Co., 261 U.S. 45, 63, 43 S.Ct. 322, 328, 67 L.Ed. 523: 'In the case before us, for the reasons we have already reviewed, we think that Eibel made a very useful discovery, which has substantially advanced the art. His was not a pioneer patent, creating a new art; but a patent which is only an improvement on an old machine may be very meritorious, and entitled to liberal treatment. Indeed, when one notes the crude working of machines of famous pioneer inventions and discoveries, and compares them with the modern machines and processes exemplifying the principle of the pioneer discovery, one hesitates in the division of credit between the original inventor and the improvers,

and certainly finds no reason to withhold from the really meritorious improver the application of the rule "ut res magis valeat quam percat," which has been sustained in so many cases in this court.'

"The rule applicable is thus stated in the leading case of Winans v. Denmead, 15 How. 330, 342 [56 U.S. 330], 14 L.Ed. 717:

"Patentable improvements in machinery are almost always made by changing some one or more forms of one or more parts, and thereby introducing some mechanical principle or mode of action not previously existing in the machine, and so securing a new or improved result. And, in the numerous cases in which it has been held, that to copy the patentee's mode of operation was an infringement, the infringer had got forms and proportions not described, and not in terms claimed. If it were not so, no question of infringement could arise. If the machine complained of were a copy, in form, of the machine described in the specification, of course it would be at once seen to be an infringement. It could be nothing else. It is only ingenious diversities of form and proportion, presenting the appearance of something unlike the thing patented, which give rise to questions; and the property of inventors would be valueless, if it were enough for the defendant to say, your improvement consisted in a change of form; you describe and claim but one form; I have not taken that, and so have not infringed.

"The answer is, my improvement did not consist in a change of form, but in the new employment of principles or powers, in a new mode of operation, embodied in a form by means of which a new or better result is produced; it was this which constituted my invention; this you have copied, changing only the form; and that answer is justly applicable to this patent.

"And the rule was applied and stated with great clarity by Mr. Justice Clif-

ford in Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935, from which we quote as follows:

"Except where form is of the essence of the invention, it has but little weight in the decision of such an issue, the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result."

*See also* Marvel Specialty Company v. Bell Hosiery Mills, Inc., 330 F.2d 164, 174–175 (4 Cir. 1964); Specialty Equipment & Mach. Corp. v. Zell Motor Car Co., 193 F.2d 515, 518–519 (4 Cir. 1952).

For infringement the equivalent need not have been known at the time of the invention. Waterproof Insulation Corp. v. Insulating Concrete Corp., 153 F.Supp. 626, 631 and footnote 9 (D.Md. 1957).

"An equivalent is no less an equivalent merely because it was unfamiliar at the time of the invention."

Technican Instruments Corp. v. Coleman Instruments, Inc., 255 F.Supp. 630, 641 (D.Ill.1966), aff'd. 385 F.2d 391 (7 Cir. 1967).

The Court concludes that the accused carton performs substantially the same function in substantially the same way to obtain the same result as the Reifers carton, is an equivalent thereof, and infringes Claim 1 of Reifers '094.

### 3. *Alleged Unenforceability of '094.*

 Defendant contends that in any event the '094 patent is unenforceable because of "fraud" practiced on the Patent Office in the prosecution of the patent. Apparently reliance is placed upon six alleged grounds:

(1) Misrepresentation as to the "Dogma of the Art" with respect to the location of the male and female members on pulp cartons shown in the prior art.

(2) Nondisclosure of Cox Patents Nos. 2,517,465, 2,637,479 and 2,655,303.

(3) Nondisclosure of the pending Comstock patent application.

(4) Nondisclosure of existing closure machinery.

(5) Misrepresentation as to the commercial success of Cox '233.

(6) Misrepresentation of Plaintiff's search of the prior art.

(1) and (2) may be treated together. A recital of the contentions would unduly burden this opinion, since they are merely repetitious of the extensive arguments made, fully considered, and rejected in *Walterhoefer,* 289 F.Supp. at pp. 570–572. The Court has again considered these arguments and is still of the opinion that its conclusion therein expressed was and is correct—the conduct, whether of omission or commission attacked by defendant therein and Defendant herein does not constitute fraud or inequitable conduct.

In so concluding the Court has been fully mindful of the increasing liberality in determining what constitutes fraud upon, or inequitable conduct before, the Patent Office; e. g., Precision Instrument v. Automotive Maintenance, 324 U.S. 806, 818, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); Charles Pfizer & Co. v. Federal Trade Commission, 401 F.2d 574, 579 (6 Cir. 1968); Beckman Instrument, Inc. v. Chemtronics, Inc., 428 F.2d 555, 564–565 (5 Cir. 1970).

(3) Defendant contends that at the same time that Reifers' attorney argued to the patent Examiner that the Koppelman carton could not be made in a single molding operation, Plaintiff was prosecuting a patent on the "jet principle" that could be used to make Koppelman cartons. The "jet principle" patent, the Comstock patent, was issued as Patent No. 2,923,654 [69] on February 2, 1960, on application filed January 6, 1955.

Of course, the Reifers invention occurred, and his patent application was filed, well before Comstock.

The argument in the Patent Office that "intermediately positioned apertures cannot actually be formed simultaneously with the suction molding of the body of the carton" was and is literally true. The fibers form the body of the carton by application of suction when the mold is immersed in the wet slurry. It is at this point that the air jetting occurs. As the patent states:

". . . Upon emerging from the slurry a phase ensues in which an air pressure jetting is performed on the wet layer adjacent the areas of the rough apertures resulting from non-deposition of fibers, and it is with this operational phase that the invention deals . . ." [70]

\* \* \* \* \* \*

"Air jetting as mentioned above comes into play at the instant the face of the molding screen at the aperture area comes clear of the slurry . . ." [71]

"Through the agency of pressure jetting and timing instrumentalities of the general character referred to, each of the molding heads is subjected to air jetting exactly at the conclusion of fiber deposition . . ."[72]

Under Comstock, the air jetting occurs at the conclusion of fiber deposition; i. e., immediately after the body has been molded. In the accused carton, the holes are punched immediately after the body has been molded by thermoforming.

---

69. Defendant's Exhibit 33.

70. Defendant's Exhibit 33, Col. 2, ls. 7–12.

71. Col. 2, ls. 17–20; Transcript 510.

72. Col. 3, ls. 29–32.

There was no misrepresentation to the Patent Office.

(4) Defendant contends that Plaintiff failed to disclose to the Patent Office the existence of automatic machinery for closing existing molded pulp cartons.[73] There was no need to make such disclosure.

While of course a satisfactory egg carton must be nestable and capable of automatic filling and closing, which requirements were met by Cox '233, none of the cartons prior to Reifers '094 was susceptible of satisfactory automatic *locking*,[74] or of subsequent manual opening and reclosing. It was to these last two aspects that Reifers directed his attention,[75] and in which lie his invention.

(5) Defendant claims that in the prosecution of the '094 patent, the Cox '233 patent was referred to as commercially unsuccessful, although 20,000,000 cartons had been sold. Cox '233, although not satisfactorily susceptible of automatic locking, was the best of its kind until the Reifers '094 appeared on the market. It immediately superseded Cox '233, and at the time of trial was being sold at a rate in excess of 1,400,000,-000 cartons a year.

(6) Defendant further contends that in the prosecution of Reifers '094 the Patent Office was advised that a full search of the art had been made. This was true,[76] even although Reifers himself was not personally fully familiar therewith.[77]

## CONCLUSION

 1. Reifers '094 is valid.

2. The accused carton infringes Claim 1 of Reifers '094.

3. Plaintiff is not estopped or barred from enforcing Claim 1 of Reifers '094 against Defendant.

The foregoing opinion embodies the Court's findings of fact and conclusion of law, whether or not expressly so denominated. F.R.C.P. 52(a).

Counsel may submit an appropriate form of judgment within ten days.

---

73. Defendant's Main Brief After Trial, 181–183.

74. 289 F.Supp. at 568.

75. 289 F.Supp. at 552.

76. 289 F.Supp. at 567.

77. Possibly an advantage. See 289 F.Supp. at 552, fn. 3.